MILLER, ETC. *v.* ORTMAN, ETC., ET AL.

[No. 29,455. Filed July 12, 1956. Rehearing denied October 17, 1956.]

642

644

*Owen Crumpacker, Edmund A. Schroer, Theodore Gemberling, Lowell E. Enslen,* and *Crumpacker & Schroer,* all of Hammond, for appellant.

*Straley Thorpe, James J. Richards, Eugene Tyler,* of Hammond, *Cope J. Hanley,* of Rensselaer, and *Ross, McCord, Ice & Miller,* of Indianapolis, for appellees.

ACHOR, J.—This is an action for the malcious destruction and appropriation of a business operated by appellant J. Carter Miller, d/b/a Midwest Supply Company. A judgment for the appellees was affirmed by the Appellate Court. At the outset, we are confronted with the contention that transfer to this court should be denied for the reason that the petition for rehearing filed in the Appellate Court did not conform to Rule 2-22 of this court. The issue is significant because of the fact that the filing of a valid petition for rehearing in the Appellate Court, asserting the errors relied upon, is a condition precedent to the granting of a transfer in this court. However, under the circumstances of this case, the issue of the right of this court to consider the case on petition to transfer is dependent upon the answer to two questions: (1) Was the petition for rehearing so defective as to warrant its total rejection by the Appellate Court? (2) Did that court, by discussing the issues presented by the petition, in an opinion supplemental thereto, in effect waive any defects in the form of the petition?

We will first consider the sufficiency of the form of appellant's petition for rehearing. Rule 2-22 provides in part as follows: "Application for a rehearing of any cause shall be made by petition, separate from the briefs, . . . stating concisely the reasons why the decision is thought to be erroneous. . . ."

On examining the petition, it is apparent that the petition was not made and filed under separate cover from the briefs. Was this failure, in itself, sufficient cause for refusing to consider either the petition or the argument in support thereof? Although Rule 2-22 merely states that the application shall be *made* by petition, separate from the briefs, and does not expressly state that the petition and briefs shall be *filed* under

separate cover, we consider such to be the intention of the rule. Therefore, the first question we must decide is whether such failure is cause for arbitrary rejection of the pleading in toto. Appellees contend that it is and, in support of their position, cite the cases of *Terre Haute, etc., Traction Co.* v. *Scott* (1930), 91 Ind. App. 690, 170 N. E. 341, 172 N. E. 659, and *The Baltimore, etc., R. W. Co.* v. *Conoyer* (1897), 149 Ind. 524, 48 N. E. 352, 49 N. E. 452. In each of these cases the court held that the petition for rehearing presented no issue because of the failure to conform to a similar rule. However, an examination of each of these cases discloses that the "petitions" consisted only of a reargument of the respective cases on their merits, without the benefit of any concise statement of the reasons why the respective decisions were thought to be erroneous. Clearly, a "petition for rehearing" so drafted presents no issue any more than would the argument portion of a brief without an assignment of errors.

However, we are here presented with a different situation. The petition as drafted first sets forth in "summary" from the numerous particulars wherein appellant asserts that the decision of the Appellate Court was erroneous. This "summary of the petition for rehearing" gives the page number within the petition where each of said summarized errors is again stated in condensed form, separate from and followed by an argument in support thereof.

Under the circumstances presented, was it proper for the Appellate Court to refuse to consider the petition for rehearing because of appellant's failure to file his petition and briefs under separate cover, even though certain of the grounds relied upon for rehearing are clearly and concisely stated in rhetorical form, separate from the argument in support there-

of? In answering this, we are confronted with these considerations: (1) The fact that the proceedings is already before the court, and therefore the form of the petition is not jurisdictional, (2) the declared policy of both the legislature[1] and our courts[2] is to liberally construe our rules of procedure to the end that, where possible, litigants may have their cases determined upon the merits.

Under the circumstances presented, we are of the opinion that we should be guided by the test as to whether appellant has made a good faith effort to com-

1. "The court must, in every stage of the action, disregard any error or defect in the pleadings or proceedings which does not affect the substantial rights of the adverse party; and no judgment can be reversed or affected by reason of such error or defect." Section 2-1071, Burns' 1946 Repl. (Acts 1881 (Spec. Sess.), ch. 38, Sec. 138, p. 240.)

"No judgment shall be stayed or reversed, in whole or in part, by the Supreme Court, for any defect in form, variance or imperfection contained in the record, pleadings, process, entries, returns or other proceedings therein, which, by law, might be amended by the court below, but such defects shall be deemed to be amended in the Supreme Court; nor shall any judgment be stayed or reversed, in whole or in part, where it shall appear to the court that the merits of the cause have been fairly tried and determined in the court below." Section 2-3231, Burns' 1946 Repl. (Acts 1881 (Spec. Sess), ch. 38, Sec. 659, p. 240.)

2. *The Louisville, New Albany and Chicago Railway Co.* v. *Creek, Admr.* (1891), 130 Ind. 139, 29 N. E. 481, 14 L. R. A. 733; *Perkins* v. *Indiana Mfg. Co.* (1915), 58 Ind. App. 220, 108 N E. 165.

"The appellate courts are committed to the policy of attempting to decide all cases upon their merits whenever possible, with increasing regard for the substance and diminishing regard for the form. *Security Sav. & Loan Ass'n* v. *Morgan* (1939), 106 Ind. App. 437, 20 N. E. 2d 707; *Starke* v. *State* (1943), 113 Ind. App. 589, 49 N. E. 2d 968. To that end it is the policy to place a liberal construction upon the Rules. *Martin* v. *Petgen* (1937), 104 Ind. App. 308, 11 N. E. 2d 59." Flanagan, Wiltrout & Hamilton's Indiana Trial & Appellate Practice, Sec. 2115, ch. 40, p. 4.

ply with the rule.[3] We judicially know that heretofore our courts have considered numerous cases on petition for rehearing and transfer where the petition for rehearing and briefs in support thereof have been composed separately but filed under a single cover, although the issue has not heretofore been specifically raised. Because of this practice in which our courts have acquiesced, and because the rule does not expressly exclude the construction which appellant gave it, we cannot say that appellant did not make a good faith effort to comply with the actual intent of the rule. Because of the complexity of issues in this appeal many issues are raised in the petition for rehearing. It is a fact that, in some instances, the reasons relied upon are not concisely stated separate from the argument. They are therefore ignored. However, in those instances where the reasons relied upon are concisely stated in rhetorical form separate from the argument in support of the particular issue, such reasons should have been considered by the Appellate Court.

We therefore proceed to consider the case upon its merits. Among the alleged errors stated in the petition for rehearing, and now asserted as cause for transfer, is the failure of both the trial court and the Appellate Court to comprehend the theory of the action as an action for injunctive relief against the malicious destruction and appropriation of appellant's separate and lawful business. Appellant asserts that this failure is apparent from the opinion of the Appellate Court, which expressly misdescribes the action as charging appellees ". . . with having conspired to unlawfully force a *breach of a certain contract* between the Midwest (appellant) and the Corporation (appellees),

3. *Allen* v. *Public Service Co.* (1952), 122 Ind. App. 421, 104 N. E. 2d 756.

. . ."[4] (Our italics.) Appellant also asserts that this failure of the trial court to comprehend the theory of the action is made apparent from the findings of fact and conclusions of law which the court both stated and failed to state.

Also, as heretofore stated, appellant asserts that the decision of the Appellate Court contravenes the ruling precedent of this court, relative to injunctive relief against tortious destruction of a business, as established in the cases of *Jackson* v. *Stanfield* (1894), 137 Ind. 592, 36 N. E. 345, 37 N. E. 14 and *Shoemaker* v. *The South Bend Spark Arrester Co.* (1893), 135 Ind. 471, 35 N. E. 280, 22 L. R. A. 332.

We now proceed to consider upon the merits the above issues presented by appellant's petitions for rehearing and transfer. We begin with a statement as to the nature of the action: As heretofore stated by appellant in his petition for rehearing, this is an action brought by appellant, as an individual and as sole proprietor of Midwest Supply Company (hereinafter referred to as "Midwest"), in the Lake Circuit Court, against appellees Alva Ortman, Carl Speichert, Nelson Ortman and Harold Ortman, individually and as officers and directors of appellee Ortman-Miller Machine Company, Inc. (hereinafter referred to as the "Corporation") and appellee Straley Thorpe, as an individual. Appellee "Corporation" was granted leave to intervene as a party-defendant. The action is in equity for an injunction and damages because of the alleged acts committed pursuant to conspiracy by the appellees, as individuals and officers of the "Corporation," to tortiously destroy appellant's separate business as Midwest Supply Company, and to appropriate that business for their mutual benefit.

---

4. 124 N. E. 2d 390, at p. 392.

The primary tortious acts allegedly committed by appellees, in the consummation of such conspiracy, are as follows: (a) Deposing appellant as President of the "Corporation" and appropriating his salary and income therefrom; (b) forcing and accomplishing a breach between "Midwest" and its dealers and sales representatives, with the further purpose of destroying "Midwest" and appropriating said dealers, sales representatives and profits to themselves.

Special findings of fact and conclusions of law were requested and stated by the trial court. The findings as stated contained many evidentiary facts and conclusions of fact and law which are improper. However, because the issues which we must consider in deciding this case deal largely with these evidentiary facts, ultimate facts and conclusions of fact and of law, they are hereinafter set out in full.

—1—

"Plaintiff, J. Carter Miller, filed this action in the Lake Circuit Court at Crown Point, Indiana, on March 13, 1952. He brings the action in his individual capacity and as the sole owner and proprietor of a business carried on by him under the firm name and style of Midwest Supply Company, 706 Wentworth Avenue, Calumet City, Illinois. The Midwest Supply Company (hereinafter referred to in these findings as 'Midwest') is a machine tool and accessory distributor with dealers and sales representatives located in various industrial areas throughout the United States and Canada. As such distributor it purchases and sells, through its dealers and representatives, various types of machine tools and accessories, and allied equipment. In addition to the relief sought individually and as owner of 'Midwest,' plaintiff seeks incidental and ancillary relief and protection in equity for his rights as President, Director and shareholder of an Indiana corporation known as Ortman-Miller Machine Company, Inc., 1222-150th Street, Hammond, Indiana. Ortman-Miller Machine Company, Inc.,

hereinafter referred to in these findings as the 'Corporation,' was incorporated in 1945 with fifty shares of no-par common stock outstanding, owned (except for a brief period following incorporation) in equal shares (ten shares each) by plaintiff and defendants, Alva Ortman, Nelson Ortman, Harold Ortman and Carl Speichert. It operates a machine shop, and manufactures for sale upon the open market machined metal parts for use in the machine tool industry. Since January of 1948 its principal product has been a machined pneumatic and hydraulic cylinder for use in providing reciprocating motions in industrial and farm machines of many types. In addition to the manufacture of cylinders, it does machine shop work, from time to time and to a limited extent, under contract for other manufacturers of metal machine tool products. The 'Corporation' was made a nominal defendant and summons issued and served upon it although no relief was or is sought against it in the complaint. In addition, on March 17, 1952, through defendants, Straley Thorpe and Alva Ortman, an ex parte order was obtained in the Lake Circuit Court making the 'Corporation' a party defendant. Plaintiff, J. Carter Miller, individually and defendants, Alva Ortman and Carl Speichert, were the original incorporators of the 'Corporation' and its first stockholders, officers and directors. Some time after its incorporation, defendants, Harold Ortman and Nelson Ortman, became stockholders, through a transfer of ten shares each from their brother, Alva Ortman, who originally owned 30 shares of stock. Upon receiving the stock, defendants, Nelson Ortman and Harold Ortman, were made, by mutual agreement and common consent, directors of the 'Corporation.' Thus, since prior to the production of the cylinder in 1948 plaintiff and the defendant, Ortman and Speichert, have been the sole stockholders and directors of the 'Corporation' for approximately three years prior to March 12th, 1952.

—2—

Plaintiff Miller was educated in business administration and basic mechanical engineering at Indiana University, Purdue and Indiana Extension,

and Armour Institute. In February of 1940 he obtained employment at the Pullman-Standard Car Manufacturing Company, in Hammond, which company was manufacturing ordnance material for the British and American governments, and produced considerable quantities of ordnance material for the armed forces during the last war. Starting out as a beginner inspector, he worked up to general foreman and co-ordinator between quantity and quality production at the time he left Pullman-Standard in January of 1945. During the period of this employment he gained experience in tool design, production methods, sub-contract procedures, foundry experience, and precision manufacturing methods. Having become acquainted with defendant Alva Ortman during the early fall of 1944, he left Pullman-Standard to form the Ortman-Miller Machine Corporation, Inc. Plaintiff invested One Thousand Dollars ($1,000.00) cash, defendant Speichert One Thousand Dollars ($1,000.00) cash, and defendant Alva Ortman small lathes, drill presses, a milling machine, and small tools (valued at $3,000.00 by the incorporators) as the paid-in capital. These incorporators became the Corporation's first Board of Directors, and its President, Secretary-Treasurer, and Vice-President, respectively. The building at 1222-150th Street was rented as the factory premises. Plaintiff solicited job orders and handled the administrative work of the 'Corporation,' while defendants Alva Ortman and the Speichert, skilled machinists, operated the machines. When defendants Nelson Ortman and Harold Ortman were released from the army service, they were given ten shares of stock each by Alva Ortman, made directors of the corporation, and put to work on the machines. That the defendants Alva Ortman, Carl Speichert, Nelson Ortman and Harold Ortman were mechanics and machinists and were not familiar with business administration and relied upon the plaintiff, J. Carter Miller, to look after all the business affairs of the corporation.

—3—

That some time in 1946, J. Carter Miller obtained a license from the Federal Government to sell sur-

plus government machinery and thereafter and until late in the year of 1947 when sales of surplus machinery came to an end, the said Miller sold surplus machinery, either personally or through various persons to whom he paid a part of his commissions. Sometime between these dates, the said J. Carter Miller took the trade name of Midwest Supply Company and was the sole proprietor of the business done under said name. That said Miller established an office in Calumet City, Illinois, at 706 Wentworth Avenue in space occupied by one Louis Bierman, a general accountant, who was employed by Ortman-Miller Machine Company, Inc.

—4—

That during the year 1948, arrangements were made for the manufacture of hydraulic and pneumatic cylinders in the Ortman-Miller Machine Company, Inc., plant at 1222-150th Street, Hammond, Indiana.

—5—

That during all of the time set out herein and until February 19, 1952, the plaintiff, J. Carter Miller, as president of the Ortman-Miller Machine Company, Inc., had taken over the general management and direction of the affairs of said corporation, over which he assumed personal control and responsibility; that during all of the times aforesaid, the said J. Carter Miller was paid a salary and bonuses equal to that paid to each of the other officers and directors.

—6—

In December of 1947, plaintiff Miller started to set up distributors for the cylinder. The first distributor set up was Jarrett Compressor and Equipment Company, of New Jersey. The second distributor arranged for was Hackett Brothers, of Fort Wayne, Indiana. The third distributor was Barney Machine Company, of Pittsburgh, Pennsylvania. Ruckerf Company (Oakland, California), Parker-Armstrong Company (Philadelphia), Neil K. Armstrong Company (Collingswood, New Jersey), Knox, Incorporated (East Walpole, Massachusetts), H. D. MacRae (Rochester, New York), As-

sociated Pneumatics (West Hartford, Connecticut), Hanscomb-Rogness (Minneapolis, Minnesota), Lincoln Supply Company (Providence, Rhode Island), and Beckett-Harcum Company (Wilmington, Ohio) also became distributors.

In addition to the distributors above mentioned the plaintiff, J. Carter Miller, became a distributor for the 'Corporation' and did business under the firm name and style of Midwest Supply Company, with its principal place of business in Calumet City, Illinois.

Each of the distributors had dealers and/or sales agents either under contract or employed by them. That the Midwest dealers were and are Air Control Development Company (now Air Control, Inc.), Walter Norris Engineering Company, the Mercer Company and Pneumatic Engineering Company. In addition 'Midwest' has had the following sales agents: Gilmore Sales Company, P. W. Rice, Thomas Scaffe, Sintis Engineers, H. C. Halbert, Industrial Sales and Engineering and C. P. Elliott. In addition 'Midwest' has a branch sales office (Midwest Supply Company of Canada in Toronto, Canada) under direction of one Neil Groom. That all of the distributors were treated on an equal basis by the 'Corporation.'

The Court further finds that none of the said distributors has or had a formal written contract with the corporation. That each has a clearly defined geographical area in which each exercises exclusive jurisdiction and sales rights which was assigned by the plaintiff acting as President of the 'Corporation.'

That the 'Corporation' never has had a sales organization as such and all of its marketing of the sales has been handled through the above mentioned distributors and each distributor has been allowed a thirty per cent discount on all sales.

—7—

The Court further finds that simultaneously with the setting up of the independent distributors mentioned in finding six and over a period of time from January, 1948, through the summer of 1949, 'Mid-

west' organized and established its own dealers and representatives. That the plaintiff as President of the 'Corporation' assigned to the 'Midwest' the most lucrative sales territory and ultimately and on the 26th day of February, 1952, controlled approximately 65 per cent of the sales of the products of the 'Corporation.'

—8—

The Court further finds that the products produced by the corporation are sold directly to their various distributors and that each distributor becomes indebted to the 'Corporation' for each purchase made by it from the 'Corporation.'

The Court further finds that at no time has there been any express or implied contract between the corporation and any of its distributors concerning the length of time each distributor agreed to sell the 'Corporation's' products in the territory assigned to it, and that there never has been any express or implied contract between the 'Corporation' and any of its distributors concerning the length of time it would be obliged to sell its products to the distributor and that the 'Corporation' has not by any express or implied contract with any of its distributors agreed to extend exclusive distributorship to its various distributors in the territory assigned to each of them for any specific time.

—9—

The Court further finds that as between the 'Corporation' and the 'Midwest' that no agreement was ever entered into by which they bound themselves to continue their relationship for any certain period of time. The Court further finds that at no time since the organization of the 'Corporation' has the plaintiff ever asked for or obtained the official approval of the Board of Directors of the Corporation for him to act as a distributor of the 'Corporation' for its products, and that he has never made a full disclosure to all the members of the Board of Directors of the 'Corporation' that he was acting as a distributor for the 'Corporation' under the firm name and style of Midwest Supply Company.

—10—

The Court further finds that the said J. Carter Miller, d/b/a Midwest Supply Company, was indebted to the 'Corporation' in the amount of $95,013.69 for the products of the 'Corporation' which has been sold through the Midwest Supply Company, which said sum is net after charging off the said thirty per cent discount, and has refused to pay the same to the 'Corporation' upon the advice of his counsel. That on or about March 10, 1952, a statement was submitted to the said J. Carter Miller by Clarence Harney, the auditor of the company, for the sum of $95,013.69 which the said J. Carter Miller acknowledged as the correct amount due and owing by him to the 'Corporation.'

—11—

The Court further finds that from the time of the inception of the 'Corporation' up to and including 1950, the business of the 'Corporation' was kept on a cash basis instead of an accrual basis, and that during the year 1951 the 'Corporation' was compelled to change from a cash basis to an accrual basis and it was then discovered that the 'Corporation' was delinquent in its income tax payments. The Court further finds that through the efforts of said accountant, Harney, the matter of the income tax for the years 1948, 1949 and 1950, was compromised with the Government in the amount of $90,000.00 of back taxes together with interest thereon for said three years in the sum of $8,000.00.

—12—

The Court further finds that due to the delinquent tax liability and the fact that J. Carter Miller was indebted to the 'Corporation' in the sum of $95,013.69, the 'Corporation' was placed in an embarrassing financial position.

—13—

The Court finds that at a special meeting of the Board of Directors of the Corporation held on the 19th day of February, 1952, at which time the plaintiff was present, it was ordered that no con-

signments be extended to anyone except the present consignments to Rucker & Co., until the further order of the Board.

—14—

And the Court further finds that on February 26, 1952, the members of the Board of Directors met and the meeting was called to order by the President, J. Carter Miller, and that at such meeting it was ordered by a majority vote of the directors that no further orders be accepted by the 'Corporation' from 'Midwest' and that pursuant to such order the representatives of the 'Midwest' were notified of the action of the Board of Directors.

—15—

The Court further finds that Section 3 of Article 3 of the constitution and by-laws of the 'Corporation' provides:

The Directors of this corporation shall be chosen by the stockholders thereof at their annual meeting to be held as provided in these by-laws, and each Director so chosen shall serve for a term of one year and until his successor is duly elected and qualified. Immediately following the adoption of these by-laws the stockholders shall choose five persons to serve as Directors until the next annual meeting of the stockholders, and until their successors are duly elected and qualified.

The Court finds that Section 5 of Article 3 of the by-laws of the 'Corporation' provides as follows:

The directors of this corporation shall elect the President, Vice-President, Secretary and Treasurer of the corporation, provided that said directors may, if they deem proper, elect one person to discharge the duties of Secretary and Treasurer. The Board of Directors may, also, if they deem proper, elect an Assistant Secretary and Assistant Treasurer.

The Court further finds that Section 1 of Article 4 of the by-laws of the 'Corporation' provides:

Clause 1.—The officers of this corporation shall be a Board of Directors, consisting of five members, a President, Vice-President and a Secretary and

Treasurer, who shall hold their several offices for the term of one year, and until their successors are elected and qualified provided that the Board of Directors may remove for cause either of said officers at any time.

Clause 2.—The Board of Directors at their first meeting after the adopting of these by-laws and at their meeting of the stockholders, as in these by-laws provided for, shall elect the officers mentioned, in Clause 1 of this Article, other than the Board of Five Directors, which shall have been chosen by the stockholders of this corporation as in these by-laws provided for.

—16—

The Court further finds that on March 5, 1952, that a special meeting of the Board of Directors of the Ortman-Miller Machine Company, Inc., was held and that all members of the Board were present except J. Carter Miller, the plaintiff in this action. That at said meeting the accountant Harney was present and that he reported to the Directors that there may be as much as $125,000.00 which Mr. Miller has withheld and has not accounted for to the 'Corporation', and that at said Board meeting said Harney was requested to run up a special audit to determine how much Mr. Miller owes the company and to report the same to the defendant Thorpe as soon as possible and to make due report to the Board at the next session of the Board of Directors.

The Court further finds that at said meeting of March 5, the Board of Directors questioned Mr. Thorpe, who was acting as the attorney for the corporation, as to the status and legal effect of the activities of J. Carter Miller in the past and present and that at said meeting said Thorpe advised the Board of Directors that while J. Carter Miller is holding office as a director and officer of the 'Corporation' and deals with himself personally in the capacity of a person who is contracting with the 'Corporation' the same would not be countenanced by the law; and that no contract of any kind should be entered into with him so long as he is an officer and director of the 'Corporation' and that

J. Carter Miller is liable to the 'Corporation' not only for the amounts which he has withheld but may also be liable for any profits which he has realized in the past in his dealings with the 'Corporation' as an officer on the one hand and a private individual attempting to contract with the company on the other.

The Court further finds that at said meeting of the Board of Directors on March 5, 1952, the said J. Carter Miller was by all of the members of the Board of Directors, except J. Carter Miller, relieved of his duties as President and employee of the 'Corporation' and that his pay was stopped as of that date and the Secretary of the 'Corporation' was directed to notify Mr. Miller of the action of the Board of Directors.

—17—

The Court further finds that on March 7, 1952, at a special meeting of the Board of Directors at which all of the members were present, defendant Thorpe reported that there was due and owing the 'Corporation' from J. Carter Miller the sum of $95,013.69, and that the said Thorpe as the attorney for the 'Corporation' had notified J. Carter Miller, by letter, of the exact amount then due and owing by him to the 'Corporation' and requested that he pay the same immediately to the 'Corporation' and at said meeting of the Board the action of the attorney was approved.

—18—

The Court further finds that the defendant Straley Thorpe in his dealings with the 'Corporation' acted solely in the capacity of an attorney and at no time conspired with the other defendants in their dealings with the plaintiff, and that the legal advice he gave to the other defendants was what he in good faith believed to be for the best interest of the 'Corporation.'

—19—

The Court further finds that the action of all the defendants, other than Thorpe, acting as the Board of Directors, in relieving J. Carter Miller of his

duties as President and stopping his salary was for the protection of their own interests as stockholders in the 'Corporation' and for the best interest of the 'Corporation.'

## CONCLUSIONS OF LAW

1. Upon the above foregoing finding of facts the Court concludes that the law is with the defendants and each of them and by reason of the fact at no time has there ever been a contract, either express of implied, between the Ortman-Miller Machine Company, Inc., and any of its distributors concerning the exact period of time each distributor agreed to sell the products of said corporation in the territory assigned to it, and no contract, express of implied, has ever been entered into by and between said corporation and any of its distributors concerning the exact period of time it would be obliged to sell its products to each distributor; and that said corporation has not by any contract, either express or implied, with any of its distributors agreed to extend exclusive distributorship to its various distributors for any certain period of time in the territory allotted to the respective distributors; and that as between said corporation and the plaintiff, d/b/a Midwest Supply company, no agreement either express or implied has been entered into by which the corporation and the plaintiff were obliged to continue their relationship for any definite period of time. The defendants Alva Ortman, Carl Speichert, Nelson Ortman and Harold Ortman, as members of the Board of Directors of said corporation, or the corporation incurred no legal liability to the plaintiff by refusing to accept further orders from the Midwest Supply Company as shown by action of the Board of Directors at its meeting on February 26, 1952, as set forth in finding number 14.

No. 2. The Court further concludes that the law is with the defendant Straley Thorpe. That he incurred no liability to the plaintiff for his conduct as attorney for the said corporation and for his legal advice to the other defendants as directors of the corporation concerning matters pertaining to the

corporation; and that the plaintiff should take nothing by its complaint as against said defendant.

No. 3.  The Court further concludes that inasmuch as the removal of the plaintiff as President of the corporation by a majority vote of its Board of Directors was for the best interest of the corporation as they honestly believed, the Court is without power to pass upon the reasonableness of the removal of the plaintiff as President of the corporation.

No. 4.  The Court further concludes that the restraining order heretofore issued by the Lake Circuit Court entered on the 13th day of March, should be in all things dissolved.

No. 5.  The Court further concludes that the plaintiff should take nothing by his complaint as against the defendants or any of them and that the defendants and each of them should recover of and from the plaintiff their costs and charges in this cause laid out and expended."

In this case appellant contends as a major cause for reversal that the trial court's decision is based upon an erroneous theory as to appellant's cause of action; that the theory upon which the decision of the trial court is actually grounded is that of breach of contract between appellant, d/b/a Midwest Supply Company and Ortman-Miller Machine Company, Inc., whereas the real theory of the action as determined by the pleadings is that of tort, namely, conspiracy to destroy and appropriate appellant's business as Midwest Supply Company.  The law is well settled that a decision grounded upon a theory action not presented by the pleadings and, therefore, not in issue, is contrary to law.[5]  Also, the law is well settled that the object of statements of findings of fact and conclusions of law in a case decided without a jury is to ascertain the

5. See: *Armacost, Administrator* v. *Lindley, Administrator* (1888), 116 Ind. 295, 19 N. E. 138.

theory on which the judge decided the case in order that the right of review for such error might be preserved.[6] Therefore, as heretofore, stated, our decision upon this issue must, of necessity, rest upon an analysis of the findings of fact and conclusions of law as stated by the court. Of necessity, this analysis must include, on the one hand, the facts found and the conclusions stated and, on the other hand, the material facts in evidence not found and the necessary resulting conclusions not stated.

In considering the sufficiency of the findings of fact and conclusions of law to sustain the decision, we recognize the general rule (a) that this court must accept ultimate facts as stated by the trial court if there is evidence to sustain them,[7] and (b) that where facts necessary to sustain the issues are not found by the trial court and the findings are silent as to such facts, they are regarded as not proved. Under such circumstances the law, in effect, implies negative findings as to such issues against the party having the burden of their proof.[8] We also recognize that, as a general rule, where the court states as a conclusion of

6. See: *Tarjan* v. *National Surety Co.* (1932), 268 Ill. App. 232; *Sacre* v. *Sacre* (1947), 143 Me. 80, 173 A. L. R. 1261, 55 A. 2d 592, 76 A. L. R. Anno. 1137, 1145, 5 C. J. S. 1197, Sec. 1790, 89 C. J. S. 425, *in re* Note 44.

7 See: *Patoka School Twp., Pike County* v. *Ashby* (1938), 105 Ind. App. 235, 14 N. E. 2d 764; *Brown* v. *Brown* (1933), 205 Ind. 664, 187 N. E. 836.

The issue as to whether certain facts found were supported by the evidence was correctly raised in this case by motion for a new trial upon the ground that the decision was not sustained by the evidence. *See* Flanagan, Wiltrout & Hamilton's Indiana Trial & Appellate Practice, Sec. 1732, ch. 25, p. 354.

8. *Newman* v. *Newman* (1943), 221 Ind. 432, 48 N. E. 2d 455; *McCoy* v. *Farm Bureau Mut. Ins. Co.* (1953), 123 Ind. App. 424, 111 N. E. 2d 728; *Stoner* v. *Howard Sober, Inc.* (1954), 124 Ind. App. 581, 118 N. E. 2d 504.

law "that the law is with the defendants," as in this case, all contrary conclusions not controlling of the general conclusion may be ignored as surplusage.[9] However, the general rule is subject to exception.

The above rules are intended to apply only where and to the extent that the findings of fact and conclusions of law as stated are related to and support the theory of the case upon which the issues are drawn. If the facts found and the conclusions of law stated demonstrate that the decision is grounded upon an erroneous and incompatible theory of action then, under such circumstances, no inference can be drawn as to the facts which are in issue under the correct theory of the case and which are supported by evidence but regarding which the court fails to make a finding of fact or state his conclusion of law as it is his duty to do.[10]

Where special findings of fact and conclusions of law are properly requested and the court fails to find facts and state conclusions of law relative to the necessary issues of the case which are supported by the evidence, but does find facts and states

9. Flanagan, Wiltrout & Hamilton's Indiana Trial & Appellate Practice, Sec. 1733, p. 356; *Smith* v. *Smith* (1953), 124 Ind. App. 343, 115 N. E. 2d 217.

10. Section 2-2102, Burns' 1946 Repl. (Acts 1881 (Spec. Sess.), ch. 38, Sec. 394, p. 240; 1923, ch. 83, Sec. 1, p. 254.)

"The trial court should find all material or controlling facts within the issues of a case where there is credible evidence on the subject. 53 Am. Jur., Sec. 1134, p. 788; 64 C. J. Trial, Sec. 1077, p. 1232. We cannot regard this as a case where a 'failure' to find is equivalent to a finding against the party having the burden. The record before us clearly indicates the court would not make a finding on the issue of actual ownership, and it further indicates the court's reason for refusing to do so. We are not at liberty to close our eyes to the truth as brought home to us by the record." *Automobile Underwriters* v. *Tite* (1949), 119 Ind. App. 251, 254, 85 N. E. 2d 365.

conclusions of law upon a diverse theory of action, from which circumstances it is apparent that the court ignored the evidence upon material issues rather than weighing it, then the decision is contrary to law[11] and the error is cause for reversal unless some fact found (and supported by evidence) is sufficient in itself to support the general conclusion "that the law is with the defendants" under any theory of the case.[12]

We therefore proceed to examine the findings of fact and conclusions of law to determine whether the court decided the case on the correct theory of the action. To accomplish this purpose, we must first examine appellant's complaint to determine the theory of his action. This must be determined by the facts complained of and the relief sought. It is urged by appellees that "The complaint charged the individual appellees with having conspired to unlawfully force a breach of contract between *Midwest* and the *Corporation,* and to depose appellant as President of the Corporation," whereas actually the primary acts complained of and the relief sought by appellant Miller was something entirely different, as shown by the complaint.

As heretofore stated, the acts actually complained of are: ". . . that the defendants . . . 'Joined in a common plan and scheme with the malicious fraudulent and tortious purpose of:'

> "(a)  Deposing him as president of the corporation and appropriating his salary and income therefrom.
> "(b)  Forcing and accomplishing (1) a breach of contract between *Midwest Supply Company and its dealers* and sales representatives with the further purpose of (2) destroying Midwest Supply

11. See: Flanagan, etc., Indiana Trial & Appellate Practice, Sec. 1733, p. 355.

12. 53 Am. Jur., Sec. 1134, p. 788, Trial.

Company and (3) appropriating the dealers, sales representatives and profits to themselves."

The relief sought by appellant, as stated in the prayer of his complaint, is for ". . . a restraining order . . . upon the defendants . . . restraining and enjoining them and/or any of them from

"(a) Committing any further acts of any kind or nature by way of interference with plaintiff's contractual relations through Midwest Supply Company with his dealers as described in paragraph (12) of this complaint.

. . . . . .

"(d) Refusing to honor orders placed with the corporation by Midwest Supply Company in the regular course of business and pursuant to accepted contract, practice and custom."

Also, that

"(4) The plaintiff have and recover damages as incidental to the granting of the permanent injunction, of and from the individual defendants in the sum of Fifty Thousand Dollars ($50,000.00)."

It is not contended by appellant that any appealable issue is presented by reason of (1) the removal of appellant from the office of President of the "Corporation," or (2) the termination of the distributorship between the "Corporation" and appellant d/b/a Midwest Supply Company standing alone. Both of these acts, although influenced by misrepresentations of the law by appellee Thorpe, were accomplished by legal means available to the other appellees. Appellant's removal from his office as president was accomplished according to the procedure provided by the By-laws of the "Corporation." And, as to the termination of appellant's contract as distributor for the "Corporation," it is admitted that there was no formal agreement relative thereto between the "Corporation" and "Midwest"

and that any oral agreement between the parties was indefinite as to time and territory. Therefore, it was within the power of the "Corporation" to terminate the distributorship contract as to *future orders* at its will.

It is the position of appellees that it was proper for the court to decide the case upon the theory of these issues which, they assert, are decisive of the case. They reason that there could be no injunctive relief against or recovery of damages for interference with appellant's distributorship business if they could lawfully terminate the contract of distributorship itself. In support of this position, appellees cite and rely upon the cases of *Grimm* v. *Baumgart* (1951), 121 Ind. App. 626, 632, 96 N. E. 2d 915, 917, 97 N. E. 2d 871; *International Shoe Company* v. *Lacy* (1944), 114 Ind. App. 641, 53 N. E. 2d 636.

In the Grimm case, *supra,* the Appellate Court correctly stated the rule that "There is no civil action for conspiracy, but rather the action is for damages caused by acts committed pursuant to a formed conspiracy rather than by the conspiracy itself. . . ." In other words, if the acts committed were lawful there could be no injunctive relief against or liability in damages because of a conspiracy to effect these lawful acts. Therefore, both of these cases are authority for the proposition that, as between the appellant d/b/a Midwest Supply Company and the "Corporation," the latter had the right to terminate the working agreement at any time as to *future orders*. It is upon this theory that the decision of the trial court is grounded.

However, the fallacy of appellees' argument and the error of the trial court lies in the fact that appellant has not made the termination of appellant's contract as to *future orders* an issue in this case. Appellant's

action is concerned with a series of wrongful acts committed by appellees, including the breach of their contract to fill orders *already accepted* from "Midwest," the interference with and misrepresentations to its dealers and sales representatives, all for the purpose of forcing and accomplishing a breach of contract between Midwest Supply Company and its dealers and sales representatives and of appropriating said business including said dealers and sales representatives, and the profits of the business to themselves. In other words, the gravamen of appellant's complaint is a conspiracy to maliciously destroy appellant's separate business as "Midwest" through a series of acts which appellees had no right to do. Therefore, the *Grimm* and the *International Shoe cases, supra,* in which only lawful acts were committed, are distinguishable from and offer no precedent for a decision in this case, wherein unlawful acts are involved.

Public policy is committed to the proposition that a man is free to conduct a lawful business[13] and that the good will of a business, including contracts with its dealers and representatives and confidential information, such as the names and addresses and requirements of customers, and the advantage acquired through representative contact with the trade in the area of their application, is a property right which an owner is entitled to protect. This he may do by contract[14] or in the absence of a contract he may protect the business against any conspiracy to destroy and appropriate it by tortious and unlawful acts.[15]

13. See: *Truax* v. *Corrigan* (1921), 257 U. S. 312, 66 L. Ed. 234.

14. See: *Donahue* v. *Permacel Tape Corporation* (1955), 234 Ind. 398, 127 N. E. 2d 235.

15. See: *Jackson* v. *Stanfield* (1894), 137 Ind. 592, 36 N. E. 345, 37 N. E. 14, *supra; Shoemaker* v. *The South Bend Spark Arrester Company* (1893), 135 Ind. 471, 35 N. E. 280, *supra.*

In the case of *Jackson et al.* v. *Stanfield* (1893), 137 Ind. 592, 608-609, 613, 36 N. E. 345, 350, 351, ▮ 37 N. E. 14, *supra,* the law applicable to a conspiracy to destroy a man's business is set forth as follows:

". . . A conspiracy formed and intended directly or indirectly to prevent the carrying on of any lawful business, or to injure the business of any one by *wrongfully preventing those who would be customers from buying anything from the representatives of such business, by threats or intimidation,* is in restraint of trade and unlawful." (Our italics.)

Also the language at page 613 of the above cited case is likewise significant:

"The great weight of authority supports the doctrine that where the policy pursued against a trade or business is of a menacing character calcu- ▮ lated to destroy or injure the business of the persons so engaged, either by threats or intimidation, it becomes unlawful and the person inflicting the wrong is amenable to the injured party in a civil action for damages therefor. It is not a mere passive, let-alone policy; a withdrawal of all business relations, intercourse, and fellowship that creates the liability, but the threats and intimidation shown in the complaint."

Also, the language in the case of *Shoemaker* v. *The South Bend Spark Arrester Company* (1893), 135 Ind. 471, 477-478, 35 N. E. 280, 283, *supra,* quoting Justice Blodgett in *Emack* v. *Kane,* 34 Fed. 46, is significant:

" 'I can not believe that a man is remediless against persistent and continued attacks upon his business, and property rights in his business, such as have been perpetrated by these defendants against the complainant as shown by the proofs in this case.

'It shocks my sense of justice to say that a court of equity can not restrain systematic and methodical outrages like this, by one man upon another's property rights. . . . ' "

We conclude, therefore, that the trial court's findings of fact and conclusions of law, which deal exclusively with appellees' right to discharge appellant as president and to terminate the "Corporation's" contract with "Midwest" with regard to "further orders" (as stated in Finding 14), both of which were *lawful* acts, are not decisive of the issue as to appellant's right to injunctive relief and damages because of the destruction and appropriation of his separate business by *unlawful* acts. It is this combination of acts, lawful and unlawful, allegedly committed pursuant to a conspiracy to destroy and appropriate appellant's separate business, and the prayer for equitable relief therefrom, which determine the theory of appellant's case. The above allegations constituted a valid cause of action and appellant was entitled to have his case decided upon this theory.

As heretofore stated, appellant was entitled to a statement of findings of fact and conclusions of law as a basis upon which to determine the theory upon which the trial court decided his case. We therefore examine the manner in which the trial court stated its findings of fact and conclusions of law upon the evidence in support of these issues to determine the theory on which the case was decided. Upon this examination appellant's case must succeed or fail.

With regard to the conclusions of law, an examination of these stated conclusions clearly demonstrates that the court considered *only* the law as it related to the discharge of appellant as president of the "Corporation" and the termination of the distributorship con-

tract as to "further orders," which were in themselves *lawful* acts. However for the reasons above stated, these conclusions of law are not decisive of the issue of conspiracy to destroy and appropriate appellant's business by resorting to other acts which were *unlawful*, which is the theory of appellant's action.

Also, for the purpose of determining the theory upon which the trial court decided the action, we next consider (1) the facts found, and (2) the facts supported by substantial evidence but not found, as they relate to the alleged unlawful acts of the conspiracy committed by appellees. The first of these alleged unlawful acts was the "Corporation's" refusal to fill orders from "Midwest" *already accepted* by the "Corporation." The court's findings of fact are wholly silent as to this very material fact which is supported by the undisputed evidence and admitted by appellees.

We next consider the court's findings of fact regarding the alleged acts of appellees, designed to destroy appellant's separate business. Upon this issue the evidence is undisputed that appellees, as heretofore stated, sent telegrams and letters to all of "Midwest's" dealers and sales representatives, notifying them of their cancellation of "Midwest's" contract and instructing them to *reorder directly with the "Corporation."* This necessitated the breach of their respective contracts with "Midwest."

Also the evidence is uncontradicted that appellees Alva Ortman and Thorpe personally called upon at least one of "Midwest's" distributors, a Mr. Gilmore in Detroit, and, in connection with their conversation with him for the purpose of persuading him to break his contract with "Midwest" and deal directly with the "Corporation", stated that there was a possibility that J. Carter Miller would be put in jail "because of the

way that business has been conducted." Such representation constituted an actionable wrong, unless justified by other facts appearing in the record.[16]

Furthermore, the evidence is uncontradicted that the "Corporation" in a separate proceedings in attachment tied up appellant's entire bank account which resulted in the "complete strangulation" of appellant's separate business with regard to this and all other products. These acts on the part of appellees, according to all the evidence, were effective in destroying "Midwest's" business as a distributor. They were pertinent to one of the most essential issues under the theory of appellant's complaint, yet the court made no finding regarding them.

Finally we consider the issue as to appellee's alleged wrongful appropriation of "Midwest's" dealers and representatives and the profits of appellant's business. The uncontradicted fact is that appellees were successful in accomplishing this appropriation as it related to the products of the "Corporation." Yet, here again, the court failed to find the facts upon this material issue in the proceedings. Failure of the court to find these facts and state conclusions of law material to the theory of the case was error[17] and the error was reversible, unless other facts found are such as to preclude recovery by appellant, notwithstanding the error.

We therefore search the record for findings of fact which, as a matter of law, would preclude recovery by appellant, notwithstanding the failure of the trial court to find the facts upon the above issues material to the

16. *Wade* v. *Culp* (1939), 107 Ind. App. 503, 508, 509, 23 N. E. 2d 615.

17. See *Automobile Underwriters* v. *Tite* (1949), 119 Ind. App. 251, 85 N. E. 2d 365; *Gulick* v. *Connely* (1873), 42 Ind. 134.

theory of the case, which were sustained by all the evidence. The court made findings of fact (10 and 17) as to appellant's indebtedness to the "Corporation." These facts may have provided additional cause for terminating the contract between appellant and the corporation as to future orders, regarding which appellant makes no issue. Did these facts, if true, also justify appellees' breach of contract with respect to orders already accepted?

We first consider the facts surrounding the refusal of appellees to fill orders for products already secured by "Midwest" through its dealers and agents and accepted by the "Corporation." Failure or refusal to pay for merchandise already delivered might be cause for such cancellation. In Finding 10 the court stated as a fact that ". . . J. Carter Miller d/b/a Midwest Supply Company, was indebted to the 'Corporation' in the amount of $95,013.60 for the products of the 'Corporation' which has been sold through the Midwest Supply Company, . . . and has refused to pay the same . . . upon the advice of his counsel. . . ." However, an examination of the evidence discloses that such refusal to pay *followed,* rather than preceded, the alleged breach of contract with respect to said orders and the alleged tortious interference with appellant's representatives and agents. This evidence indicates that this refusal to pay may well have been the consequence, rather than the cause, of the alleged tortious conduct which is the basis of appellant's complaint.

If actual refusal to pay for products already delivered was not the cause of appellees' refusal to make future delivery of orders already accepted, perhaps then appellant's failure to pay for such merchandise provided justification for such action.

The uncontradicted evidence regarding the financial relationship between "Midwest" and the "Corporation," as a result of which an indebtedness existed, is that, during the year of 1951, the "Corporation" sold $400,-000.00 to $500,000.00 of business to "Midwest" and it was customary at the end of each year for "Midwest" to owe the "Corporation" amounts as high as $125,-000.00 which would usually be received by the "Corporation" "60 to 90 days after the end of the year." In this particular instance the period of 90 days had not elapsed. The evidence is uncontradicted that, following appellant's discharge as president of the "Corporation" and his exclusion from its offices and the denial of access to its records, a statement of account was contemplated by the "Corporation" to "Midwest" but that no such statement was rendered until Thorpe's letter. The letter from Thorpe to Miller above referred to, in fact, stated in part: "I suggest, therefore, that this balance be paid as soon as possible."

Appellant's reply to the above letter is significant, as to the issue of his *refusal* to pay his account with the "Corporation" prior to their breach of contract. His letter to the "Corporation" is in part as follows:

"We have received a letter from Mr. Thorpe written evidently in answer to our letter request to Ortman-Miller Machine Co., Inc., for written statement on account.

. . .

"Copies of invoices in our hands do not as yet total $95,013.69 as mentioned by Mr. Thorpe, so if you will forward additional invoices and statements, so we can check with our records, and if they agree with your figures, *you will receive our prompt remittance.*" (Our italics.)

Furthermore, as was true of appellant's "refusal" to pay his account, the evidence in the case discloses the

further fact which completely refutes the appellees' argument that the orders already accepted were canceled because of "Midwest's" past due indebtedness. Appellees sent the telegrams and letters to "Midwest's" dealers and representatives notifying them of the cancellation of such orders *prior to* the time that Thorpe sent his statement and request for payment to "Midwest."

As heretofore stated, the court did not specifically find that the amount owing by appellant to the corporation was past due. Neither do the evidentiary facts correctly stated necessarily lead to such a conclusion.[18] Therefore, there is no merit to the proposition that appellees were justified as a matter of law in cancelling orders from appellant which they had already accepted because of a default by appellant in the payment of his account.

We next consider the facts stated in the court's Finding 9. It seems apparent from all the findings of fact and conclusions of law that the court considered the facts in this finding as they related to the right of the "Corporation" to terminate the contract as to future orders, which right, as above stated, is not in issue. The question which we must now decide is whether the facts stated in this finding are sufficient to justify the breach of contract as to the orders already secured by "Midwest" and accepted by the "Corporation" and the other alleged wrongful acts of appellees and whether because of such facts there could be no injunctive relief or damages because of any of the alleged wrongful acts of appellees. The court in Finding 9 stated:

> ". . . that at no time since the organization of the 'Corporation' has the plaintiff ever asked for or obtained the official approval of the Board of Direc-

18. See *Angola State Bank* v. *State ex rel. Sanders* (1944), 222 Ind. 244, 52 N. E. 2d 620.

tors of the 'Corporation' for him to act as a distributor of the 'Corporation' for its products, and that he had never made a full disclosure to all the members of the Board of Directors of the 'Corporation' under the firm name and style of Midwest Supply Company."

Obviously the above finding of fact is in two parts. The first is related to an "official approval" of the contract. Admittedly, the corporation had never officially approved the contract. However, such an "official approval" was not necessary if the directors, who were also all the stockholders, had either ratified the contract or were estopped to deny such ratification. This possibility is considered in relation to the issue next discussed.

We therefore proceed to consider the second part of the finding, which relates to the proposition that appellant "had never made a full disclosure." We are confronted with this question: If these facts as found are true, was not the contract between appellant d/b/a Midwest Supply Company and the "Corporation" wholly void because of appellant's fiduciary relationship with the corporation and, therefore, were not these orders secured by appellant as an officer of the corporation the property of the corporation so that the corporation was entitled to cancel them as to appellant and take all legitimate and available steps to pursue and fill them? We are given little help in the briefs upon this issue which is, perhaps, the most troublesome in the case.

The evidence in support of that part of the above finding, relative to "full disclosure," is conflicting and therefore we must accept them as stated. But is the finding as stated controlling of the issue as to the corporation's right to cancel existing orders made by appellant and accepted by the corporation and pursue these orders through "Midwest's" dealers and sales representatives?

Do these specific facts exclude the possibility that, notwithstanding the absence of "official approval" by the "Corporation" or such "full disclosure" by appellant "to all members of the Board," appellees were, nevertheless, estopped to deny the fact of such distributorship contract because of the fact that with the knowledge they did have they accepted the benefits therefrom over a long period of time?

What is the law regarding the necessity of "full disclosure" by an officer of a corporation in his dealing with the corporation? Clearly the law is not as represented by appellee Thorpe, as stated in Finding 16. The general rule on the subject has been stated by numerous reputable authorities, as follows:

> "A Director or officer of a corporation is not absolutely precluded by his official position from dealing or entering into a contract with the corporation, nor is such a transaction void per se. While it is true, on the one hand, that where the directors or officers of a corporation deal with themselves as individuals, the transactions are subject to the closest scrutiny, under the most searching light of truth, and must be characterized by absolute good faith, it is also true, on the other hand, that where persons holding positions of trust and confidence in a corporation deal with the corporation, which is also represented by others in entire good faith, fairness, and honesty, such transactions are not invalid and will be upheld. . . ." 13 Am. Jur., p. 958.

The law on the subject has also been stated as follows:

> "The rules given with reference to a director dealing with the corporation, or with himself, and requiring him to account for secret profits, do not mean that a trustee is absolutely prohibited either from dealing with the corporation or from making a profit out of his trust relation. The principles announced are intended to

prevent directors from making a secret profit in transactions between themselves and the corporation. They do not impose upon the director an absolute duty to avoid, wholly, the doing of anything for his own benefit; but his obligation to the beneficiaries in the trust is to make full, fair, and complete disclosure of all the circumstances attending any transaction which will benefit himself in any manner different from the manner in which all the shareholders will be benefited. In other words a director is allowed to contract with his corporation in a matter in which he is personally interested, provided he acts with candor and fairness and deals with the corporation on equal terms. . . ." 2 Thompson, Third Ed., sec. 1329, *Directors.*

"The contracts made by directors with themselves as individuals, are in some cases said to be void; but this word is used in the sense of ██ voidable. The correct principle is that, unless such transactions and contracts fall within the prohibition of the statute, or of a rule of the common law, it is voidable either at the election of the corporation acting through its directors or at the election of stockholders. Ratification in this class of cases, as in other instances, may be assumed from acquiescence and delay. . . . The right of ratification of a contract made with a director belongs to the stockholders and this ratification may be established by evidence of long acquiescence with knowledge of the transaction on the part of the stockholders. . . ." 2 Thompson, Third Ed., sec. 1362, *Corporation.*

Another able authority has stated the law as follows:

"Unless the rights of the public are involved or unless the contract is in violation of some positive law or well-settled rule of public policy, as a ██ general rule, if a corporation, with knowledge of the facts, accepts or retains the benefit of an unauthorized contract or other transaction by its officers or agents, as where it receives and uses or retains money or property paid or delivered by the other party, or accepts the benefit of services, etc., it thereby ratifies the contract or other

transaction, or will be estopped to deny ratification. In other words, the law does not permit a corporation to receive and retain the benefits of a contract or transaction and at the same time repudiate liability thereunder or attempt to escape the burdens thereof on the ground that the contract or transaction was not authorized, or that authority therefor was not set forth in its records. . . ." Fletcher Cyclopedia, Corporations, Perm. Ed., Vol. 2, ch. 11, sec. 773, pp. 1137-1143.

We have carefully examined all the cases which have come to our attention in which the court has enunciated the principle that an officer of a corporation who personally deals with the corporation must make "full disclosure" of his interest in the contract. In each of these cases there was a controlling statute,[19] or an unfair advantage was taken of the corporation.[20] We find no case in which a corporation in the absence of fraud or unfair dealing has been permitted to breach its contract with an officer and appropriate his separate business or the profits therefrom after knowing of the contract relationship and accepting the benefits therefrom over a long period of time.

We conclude, therefore, that in this state transactions between an officer of a corporation and a corporation

19. It is required by statute in some states that an officer of a corporation who deals with the corporation must make full disclosure of his interest or that the contract be formally approved or ratified by the corporation. *Union Die Casting Co.* v. *Anderson* (1938), 25 Cal. App. 2d 195, 79 P. 2d 703; *Kennerson* v. *Burbank Amusement Co., Inc.* (1953), 120 Cal. App. 2d 157, 260 P. 2d 823.

20. *Wainwright* v. *P. H. & F. M. Roots Co.* (1912), 176 Ind. 682, 97 N. E. 8, 11; *Schemmel* v. *Hill* (1930), 91 Ind. App. 373, 169 N. E. 678; *Westerly Theatre Operating Co.* v. *Pouzzner* (1947), 162 Fed. 2d 821; *Schurr* v. *Weaver* (1952), 74 S. D. 378, 53 N. W. 2d 290.

are, at most, voidable and that when the validity of such contracts is challenged by the corporation their validity will not be denied (as a matter of law) if such transactions are fair and honest and made in good faith and carry the earmarks of an arm's length bargain, and there is either "full knowledge" of the transaction on the part of the corporation or some knowledge of a contract relationship and an opportunity for full knowledge thereof, coupled with the acceptance of the benefits therefrom over a long period of time. Under such circumstances the corporation may be said to have ratified the contract or transaction, or be estopped to deny ratification.

We therefore examine the findings of fact to determine first whether the distributorship contract between "Midwest" and the "Corporation" was fair and honest and made in good faith. Finding 6 stated that the "Corporation" had no sales organization, that all its sales were through outside distributors and that the contract with "Midwest" was upon terms equally as favorable to the "Corporation" as any of its other distributors. The only possible negative inference on the issue of fair dealing is found in Finding 7, in which the court stated: ". . . That the plaintiff as President of the 'Corporation' assigned to 'Midwest' the most *lucrative* sales territory. . . ." However, there is no evidence to support this finding. The only evidence is that "Midwest" produced about 60 per cent of the "Corporation's" business. The evidence does not disclose whether this productivity was attributable to the territory assigned or the effectiveness of appellant's sales organization. There is no basis of fact upon which to conclude that the transaction was other than fair and honest and made in good faith and operated to the

mutual benefit of both the appellant and the "Corporation."

This brings us to the second major question. It is stated in Finding 9 that the appellant himself "had never made a full disclosure to all the members of the Board of Directors of the 'Corporation' that he was acting as distributor of the 'Corporation' under the firm name and style of Midwest Supply Company." However, as heretofore stated, this fact does not preclude the possibility that the "Corporation" had nevertheless ratified the distributorship contract or relationship or was estopped to deny such ratification because of the fact that its officers and stockholders, with some knowledge of the distributorship and the opportunity for full knowledge regarding it, accepted the benefits therefrom over a long period of time. The evidence upon these issues of knowledge and the acceptance of benefits is as follows: The appellees Carl Speichert, Alva Ortman, Harold Ortman and Nelson Ortman, who, with appellant, were the directors and sole stockholders of the Ortman-Miller Machine Company, worked together daily in the plant and discussed plant affairs. The Ortmans were brothers. All of these appellees knew they were dealing with "Midwest" as a distributor. Harold Ortman knew "that J. Carter Miller was Midwest Supply Company in 1949," and the other director-stockholder appellees "knew," "understood," or had "intimations" that appellant was Midwest Supply Company, or was connected with it. Also, on the subject of knowledge, all the invoices, totalling approximately 7,500 in number from the "Corporation" to "Midwest" and processed over a period of several years, clearly disclosed the 30 per cent financial arrangement between the "Corporation" and "Midwest." These were available to all the appellees who were offi-

cers and/or directors of the "Corporation." Also, they could have received full knowledge of the transaction from appellee Thorpe, who was attorney for the "Corporation."

Regarding the benefits which appellees received from the distributorship contract over a long period of time, the evidence is undisputed that approximately 60 per cent of the "Corporation's" total business was secured through "Midwest"; that largely through his sales organization, the "Corporation" was able to take an unpatented product and with it develop a business from a $5,000.00 corporation in 1945, without an established market, to an enterprise which in 1952 enjoyed a gross annual sales of approximately $650,000.00; that appellees knew of this phenominal growth and shared in its profits. These profits were shared by appellees in the form of salaries and bonuses which had been increased from $4,800.00 in 1946, to $12,000.00 in 1951. These profits also consisted of the increased value of their shares in the "Corporation." At the time of this action the "Corporation" had a book value of approximately $250,000.00 and a fair cash market value of $500,000.00 to $600,000.00, of which appellees Carl Speichert, Alva Ortman, Harold Ortman and Nelson Ortman each had a one-fifth interest.

We conclude, therefore, that even though the distributorship contract between the "Corporation" and "Midwest" had received no "official approval" by the "Corporation" and the appellant may not have made a "full disclosure" to the Board of Directors of the "Corporation" that he was acting as distributor for the "Corporation" under the firm name and style of Midwest Supply Company, as stated in Finding 9, nevertheless such finding does not preclude the possibility that as a result of the above facts in evidence the appellees,

directors and stockholders of the "Corporation" may have ratified the distributorship contract or were estopped to deny the fact of such ratification. We cannot say that the evidence would not sustain such a conclusion. Therefore, we cannot say that the facts stated in Finding 9 are sufficient to preclude recovery by appellant and thus make harmless the court's failure to find the facts and state the conclusions of law upon the issues presented under the true theory of appellant's cause of action.

However, appellees contend that notwithstanding the facts not specifically found as above set out, Finding 18 clearly bars recovery as against appellee Thorpe, and Finding 19 bars recovery against the other appellees. We therefore examine Finding. 18. It states first: "The Court further finds that the defendant Straley Thorpe in his dealings with the 'Corporation' acted solely in the capacity of an attorney. . . ." However, this aspect of the finding is not material. It made no difference in what capacity he acted. It was the nature of his acts and not his capacity which determines the liability for his conduct. *White* v. *McCoy Land Co.* (1936, Missouri), 101 S. W. 2d 763; *Adelman* v. *Rosenbawm* (1938), 133 Pa. Superior Ct. 386, 3 A. 2d 15. The finding then continues: "and at no time conspired with the other defendants in their dealings with the plaintiff, . . ." This is a statement of conclusion, and not a finding of ultimate fact,[21] and must be ignored as surplusage. *Byrum* v. *Wise, Receiver* (1940), 216 Ind. 678, 24 N. E. 2d 1006; *Kaufman* v. *Millies et al.* (1939), 106 Ind. App. 569, 18 N. E. 2d 970; *Lowe's*

---

21. See *Pennsylvania R. R. Co.* v. *Martin* (1951), 122 Ind. App. 28, 102 N. E. 2d 394; *Cleveland, etc. R. Co.* v. *Baker* (1899), 24 Ind. App. 152, 54 N. E. 814; *Long* v. *Archer* (1943), 221 Ind. 186, 46 N. E. 2d 818; 89 C. J. S., Trial, Sec. 647a, page 487.

Revision of Works' Indiana Practice, Vol. 3, page 301.
The finding concludes with the statement "and that the
legal advice he gave to the other defendants was what
he in good faith believed to be for the best interest of
the 'Corporation.'" Were we to consider and accept this
statement as a finding of fact, it is not material to the
issue of the case. The issue in the case is appellees'
wrongful destruction and appropriation of appellant's
separate business as "Midwest." It is possible that ap-
pellee Thorpe may have believed that his representa-
tions and conduct, although without legal justification,
were "for the best interest of the 'Corporation.'" In
fact, it is the theory of appellant's action that the whole
series of events in which he participated were designed
to appropriate for the "Corporation," without cost to it,
this very effective, established sales organization which
it did not have before. Thorpe may have considered
this acquisition "for the best interest of the 'Corpora-
tion,'" but what of appellant's rights to this distribu-
torship business which he had developed at great effort
and expense to himself? This was the primary issue
in the case. However, here again the findings are silent
on this issue. Certainly Finding 18 does not preclude
recovery under the theory of appellant's cause of action.

Finally we turn to a consideration of Finding 19. It
relates to the appellees other than Thorpe. It deals
only with the discharge of appellant as president of the
corporation. All reference to the destruction and ap-
propriation of appellant's business is again significantly
absent.

As heretofore stated, the same deficiency is found in
the court's conclusions of law. From this statement it
is apparent that the court considered only the
right of the appellees to discharge appellant as
president of the corporation and of the corpora-

tion's right of "refusing to accept *future orders* from Midwest Supply Company" solely because of the indefinite character of the distributorship contract, under which such *"future orders"* would be taken. No mention is made of destruction and appropriation of appellant's sales organization by appellees, against which interference appellant has asked injunctive relief.

It seems apparent from the facts found and not found and the conclusions stated and not stated that the court misconceived the theory of appellant's action and erroneously considered that appellant's action was related only to his discharge as president of the Corporation and to the mere termination of his contract as distributor and decided the case upon this erroneous theory. A decision based upon an erroneous theory of the cause of action is contrary to law.

Judgment is therefore reversed, with instructions to sustain appellant's motion for a new trial and for further proceedings consistent herewith.

Landis, C. J., Arterburn, Bobbitt and Emmert, JJ., concur.

NOTE.—Reported in 136 N. E. 2d 17.