## MULLETT v. EMME

[No. 20,340. Filed May 9, 1966. Remanded for findings on material issues of fact. Per Curiam filed June 11, 1969.]

*Winslow Van Horne, Grant Van Horne* and *Van Horne & Van Horne,* of counsel, of Auburn, for appellant.

*Harris W. Hubbard, Gaylord S. Gilbert,* both of Angola, for appellee.

WICKENS, J.—In a suit on account, appellant filed what he terms a cross-complaint. The account was for the sale of potatoes and defendant-appellant set up breach of warranty of fitness and suitability for use as seed, in his cross-action.

The only question here is whether the trial court sufficiently complied with the statutory requirements by stating its special findings of fact on the particular issues formed on the cross-complaint.

The cross-complaint made many material and specific allegations which were denied by the answer thereto. A trial of several days was had. Considerable evidence, relating to those issues, was submitted. The request for special finding of facts and conclusions of law was

timely filed and there appears no question as to its being proper.

Under these circumstances we are of the opinion that the statute requires the trial court to make a specific statement of ultimate facts found on the issues of both the complaint and the cross-complaint. Acts 1881 (Spec. Sess.) ch. 38, § 394, p. 240, § 2-2102 Burns' 1946 Replacement.

The parties, upon proper request have the right to such procedure. That is true even though there is a general rule that where the special findings are silent on a material fact that is equivalent to a finding against the party having the burden of proof. *Miller, etc. v. Ortman, etc., et al.* (1956), 235 Ind. 641, 665, 136 N. E. 2d 17.

We think that the general rule is designed to cover inadvertent omission of detail, and not to make unnecessary any special finding.

Appellant called the trial court's attention to the omission of special findings by specifications in his motion for new trial. This is the recognized remedy where there are factual questions which were pleaded and tried and when the court ought to have made findings. *Quick et al. v. Brenner* (1885), 101 Ind. 230, 235.

Under Rule 1-8, Rules of the Supreme Court, omissions in the special findings could have been supplied while the matter was pending on motion for new trial.

To illustrate some of the factual challenges outlined by the issues we set forth by numbers the substance of several rhetorical paragraphs of defendant's answers and cross-complaint, Paragraph II:

1. Defendant alleged he was a farmer in the business of growing and harvesting potatoes of which fact the plain-

tiff had full knowledge—this was at issue by the allegation in plaintiff's answers denying and demanding strict proof.

2. Defendant alleged that plaintiff was in the business of selling seed potatoes—which plaintiff categorically denied and demanded strict proof.

3. Defendant alleged he purchased from plaintiff seed potatoes for the sole and only purpose of planting the same—which plaintiff denied and alleged further that, if potatoes were sold, at no time were they certified as seed potatoes.

4. As to payment, the allegation and answer create another issue.

5. Defendant alleges discoloration of the potatoes delivered, notice to plaintiff thereof that plaintiff represented condition to be other than it was in truth and fact, the potatoes being infected with Verticular Wilt a condition causing many plants to wilt and die and to reduce harvest yield—all of which plaintiff denies and demands strict proof.

Rhetorical paragraphs 6, 7, 8, and 9 set up matters relating to warranty, planting, care, harvesting and damage which were placed in issue by denial. Also Paragraph III of the cross-complaint also created disputed issues.

An examination of the trial court's special findings shows that only two findings could be said to be responsive to the issues tendered by appellant's two paragraphs of cross-complaint. Those findings are:

"4. That as part of this agreement there was an implied warranty by the seller that the potatoes would be reasonably fit for use as seed.

. . . . .

"14. Some of the potato plants grown from the seed potatoes died."

We hold that the statutory language that the court shall "state the facts in writing" requires the trial court to make a good faith summary of the ultimate facts involved in the pleadings of which there is evidence when timely requested to do so. Finding that this has not been done, we are of the opinion this case should be remanded to the Steuben Circuit Court under the provisions of Rule 2-30, Rules of the Supreme Court, for findings by the trial court on the material issues of fact.

Therefore, this cause is remanded to the Steuben Circuit Court for findings by the trial court on the material issues of fact as required by Rule 2-30, Rules of the Supreme Court, 1964 Revision, such findings to be filed with this court within ninety days from the date of the filing of this opinion with the Clerk of the Supreme and Appellate Courts.

Upon the filing of such findings this cause will stand for determination on the merits here, without further briefing unless opportunity to do so is requested by the parties.

Cause remanded with instructions.

Prime, C. J., Carson and Faulconer, JJ., concur.

PER CURIAM—This is an appeal from a judgment of the Steuben Circuit Court. The issues were formed below by plaintiff-appellee's complaint in suit on account for the balance due on a sale of seed potatoes to defendant-appellant. Appellee's complaint prays for judgment in the sum of Twelve Hundred Seventy-one ($1,271.00) Dollars, plus interest. To appellee's complaint, appellant filed answer in three paragraphs. Paragraph I of appellant's answer is a denial pursuant to Rule 1-3, Rules of the Supreme Court of Indiana. Paragraph II of appellant's answer sets forth, in the way of a counterclaim, the breach of an implied warranty of quality, in which defendant alleges that the seed

potatoes purchased from plaintiff-appellee were infected with a disease known as verticillium wilt[3] and that by virtue of the presence of the disease in the seed, which appellant planted, appellant's yield was substantially reduced; that the soil of appellant's field was infected with the disease; and, that weeds grew and ripened in spaces where potato vines had died and cast weed seed rendering the field unsuitable for the planting and cultivation of potatoes in the following year, thereby forcing appellant to plant, therein a less valuable and profitable crop. Paragraph II of appellant's answer in counterclaim concludes with a prayer for Ten Thousand ($10,000.00) Dollars. Paragraph III of appellant's answer in counterclaim alleges a diminution in the yield of the potato crop, as a result of the allegedly diseased seed, with a prayer for Ten Thousand ($10,000.00) Dollars. To Paragraphs II and III of appellant's answer in counterclaim, plaintiff-appellee filed answer in denial under Rule 1-3, Rules of the Supreme Court of Indiana.

The issues were thus formed and trial was to the court. At the beginning of trial, appellant requested special findings of fact and conclusions of law. Subsequent to the trial, the court entered its findings of fact and conclusions of law, which read as follows:

### "SPECIAL FINDINGS OF FACT AND CONCLUSIONS OF LAW

"The Court, at the request of the defendant and cross-plaintiff, makes the following findings of fact:

"1. In the year 1961, the defendant and plaintiff entered into a verbal agreement, by which the plaintiff agreed to sell seed potatoes to the defendant, and the defendant agreed to purchase seed potatoes from the plaintiff.

"2. That it was agreed between the parties that the price for Wisconsin B sized russet sebago potatoes would be $3.00

---

1. From an examination of the testimony of Dr. Samson, Purdue plant pathologist, it appears that the presence of verticillium wilt in seed potatoes is not readily discernable except in more advanced stages, without laboratory analysis.

per bag and that the price for Wisconsin A-sized certified plymouths would be $3.40 per bag.

"3. It was further agreed between the parties that the defendant would make some payments upon the agreement before delivery of the seed potatoes.

"4. That as part of this agreement there was an implied warranty by the seller that the potatoes would be reasonably fit for use as seed.

"5. That on March 10th, 1961, the defendant paid plaintiff the sum of $500.00 upon the purchase price.

"6. That on April 11, 1961, the defendant paid to the plaintiff the sum of $1200.00 upon the purchase price, and also paid an additional sum of $777.60, which payments were the last made by the defendant.

"7. That on April 11, 1961, the plaintiff delivered 150 bags of B-sized Russet Sebago potatoes to the defendant, the agreed purchase price for which is $450.00.

"8. That on April 11, 1961, the plaintiff delivered 199 bags of A-sized certified plymouth potatoes to the defendant, the agreed purchase price for which is $676.60.

"9. That on April 12, 1961, the plaintiff delivered 420 bags of B-sized Russet sebago potatoes to the defendant, the agreed purchase price for which is $1260.00.

"10. On April 14, 1961, the plaintiff delivered 330 bags of Wisconsin B-sized russet sebago potatoes to the defendant, the agreed purchase price for which is $990.00.

"11. On May 3, 1961, the plaintiff delivered 124 bags of Wisconsin B-sized russet sebago potatoes to the defendant, the agreed purchase price for which is $372.00, which delivery was the last made by the plaintiff.

"12. That the sum of $1,271.00, with interest thereon from June 11, 1961, at 6% per annum, is now wholly due and unpaid.

"13. That the potatoes delivered by the plaintiff to defendant were stored by the defendant and planted by the defendant; that the planting of these potatoes commenced on the 4th day of May, 1961, and was completed on the 20th day of May, 1961.

"14. Some of the potato plants grown from the seed potatoes died.

## "CONCLUSIONS OF LAW

"1. The law is with the plaintiff on the complaint.

"2. The law is against the defendant on his cross-complaint.

"3. That the plaintiff have and recover of and from the defendant the sum of $1,271.00 principal, $228.78 interest, together with the costs in this cause laid out and expended in the sum of $————.

"4. That the defendant Gaylord Mullett take nothing by his cross-complaint herein."

Judgment was entered for plaintiff-appellee upon the complaint and against defendant-appellant upon the counterclaim. Thereafter, appellant filed his motion for a new trial, which reads as follows:

"1. The finding of the Court is not sustained by sufficient evidence.

"2. The decision of the Court is not sustained by sufficient evidence.

"3. The finding of the Court is contrary to law.

"4. The decision of the Court is contrary to law.

"5. Error of law in this, that although the defendant made timely request that the Court find the facts specially and state his conclusions of law thereon, the Court failed and refused to find the facts specially upon the issues tendered by this defendant's cross-complaint.

"6. Error of law in this, that although defendant made timely request that the Court find the facts specially and state his conclusions of law thereon, the Court failed and refused to state his conclusions of law upon the issues tendered by defendant's cross-complaint."

Defendant-appellant appealed to this court after the overruling of his motion for a new trial. We remanded the cause to the trial court for further findings of fact upon the issues presented by appellant's counterclaim. See *Mullett v. Emme* (May 9, 1966), 144 Ind. App. 638, 216 N. E. 2d 366. There-

after, the trial court filed with this court, additional findings of fact, which read as follows:

"15. The defendant had been a farmer for 40 years at the time of the trial of this case, and during this period he was in the business of growing and harvesting potatoes in Steuben County, Indiana, for sale, of which facts the plaintiff had full knowledge at the time of the sale which is the subject of this case.

"16. The plaintiff had been in the business of buying and selling table and seed potatoes for 18 years at the time of the trial of this case.

"17. The plaintiff had sold potatoes to the defendant for a period of 10 years immediately prior to November of 1961.

"18. In 1960 the defendant planted about 90 acres of potatoes, forty of which acres were planted on 40 acres owned by the defendant and hereinafter referred to as the Mullett farm and 50 of which acres were planted on a farm consisting of about 60 acres hereinafter referred to as the Myers farm.

"19. At no time herein was the defendant the owner of the Myers farm.

"20. The defendant did rent the Myers farm in 1960, 1961 and 1962 for the purpose of farming it in potatoes.

"21. From the 90 acres planted by the defendant in 1960, 40 acres on the Mullett farm and 50 acres on the Myers farm, the defendant harvested 13,640 bags of A sized potatoes.

"22. In 1961 the defendant planted 98 1/2 acres of the same fields as in 1960, 40 acres of the Mullett farm and 58 1/2 acres of the Myers farm, and received therefrom a total yield of 15,446 bags of A sized potatoes.

"23. In 1962, the defendant planted the same fields that were planted in 1960 and 1961, with the exception that he planted only 80 acres of these fields. This 80 acre planting resulted in a total yield of 16,180 bags of A sized potatoes.

"24. B sized potatoes are less than 1 7/8 inches in diameter.

"25. In 1962, the defendant planted sufficient B sized russet sebago potatoes, culled from the 1961 crop, to result in a yield of 9,150 bags of A sized russet sebago potatoes.

"26. Some of the land on the Myers farm is better and will result in higher yields of potatoes than the land on the Mullett farm, and some of the land on the Myers farm is worse and will result in lower yields of potatoes than the land on the Mullett farm. The Mullett farm is better drained than the Myers farm.

"27. The plaintiff delivered to the defendant a total of 1,054 bags of B sized russet sebago potatoes in 1961, none of which russet sebago potatoes were certified. Of the 150 bags of B sized russet sebago potatoes delivered to the defendant on April 11, 1961, some contained potatoes with spots on them in the bottom of the bags at the time of delivery. Of the 420 bags of B sized russet sebago potatoes delivered to the defendant on April 12, 1961, 15 to 20 bags showed some wet spots on them at the time of delivery. A day or so after delivery of these potatoes on the 11th and 12th of April, 1961, the defendant complained to the plaintiff about the said wet spots.

"28. There is an unexpressed term of the agreement of the parties to this case arising out of a custom in this area, in which the parties to this case trade, to-wit: that the defendant agreed to accept and pay for spoiled potatoes as part of those sold to him by the plaintiff so long as the number of such rotten potatoes did not exceed 2 percent of those purchased.

"29. The russet sebago potatoes were stacked by the defendant in rows, after unloading, head high in bars with two bags laying in one direction and then two bags on top of them laying across them the other way.

"30. Some of the russet sebago potatoes were stacked head high in the manner described in the last paragraph in a barn 22 by 50 feet. The potatoes were stacked in bags as high as a man's head over an area either 12 by 50 feet or an area 22 by 40 feet.

"31. In 1961, there were 28 acres of russet sebago, B sized, uncertified potatoes planted by the defendant on the Myers farm. Those russet sebago potatoes planted there were those complained of by the defendant to the plaintiff. All the russet sebago, B sized, uncertified potatoes were planted by the defendant with the exception of 5 to 10 bags which were discarded before planting because rotten.

These acres were planted between the 15th and 20th of May, 1961. Some of the potatoes planted in this 28 acre field were infected with fusarium and blackheart at the time they were planted, and the defendant had knowledge of this infection. Some of these potatoes had been stored by the defendant in the manner described above for 49 days before they were planted and in temperatures ranging from 82° Fahrenheit to 29° Fahrenheit and averaging 50° Fahrenheit.

"32. An otherwise healthy and solid potato subjected to a complete lack of oxygen for a week in a warm place, will produce blackheart. It is probable that portions of the bags of russet sebago B sized potatoes stored by the defendant in 1961 in the manner described above, were shielded from oxygen and developed blackheart.

"33. In July, 1961, approximately 11.8% of the 28 acre field of russet sebago potatoes on the Myers farm, were yellowed, stunted or missing entirely. Some of these yellowed and stunted potato plants were damaged by verticillium wilt of the type that persists in the soil once introduced. Some of the potatoes planted in this area did not sprout or grow at all. Some of these yellowed and stunted plants were infected with early blight and fusarium wilt during the growing season of 1961. Insufficient pesticide was applied to the 28 acre field of russet sebago potatoes on the Myers farm to protect it from damage by insects.

"34. There are two types of verticillium wilt. The first type persists in the soil once it is introduced. The second type is the northern variety. Five or six other fields in Steuben and DeKalb counties, Indiana had same infection of verticillium wilt as the defendant's during the summer of 1961. The defendant's plants that were tested had the first type of verticillium wilt, namely, the type that persists in the soil after introduction. The lack of nitrogen and the waterlogged soil are helpful to verticillium.

"35. The harvest of potatoes from the 28 acre field of russet sebago potatoes was less than would have resulted if the defendant had adequately ventilated the seed potatoes which he stored; if he had not planted seed infected with fusarium and blackheart; if he had sprayed the plants with adequate amounts of fungiside (sic) and insecticide; and if the plants in the field had not become infected with verticillium wilt and bacterial soft rot. The extent to which each of these factors contributed to the size of the harvest was never established by the evidence."

In the argument portion of his brief, appellant has failed to contest plaintiff-appellee's recovery and we therefore consider that portion of the court's judgment granting relief to appellee upon his complaint, as undisputed.

However, appellant contends that the findings of the court, as supplemented, are still inadequate in that the material issues presented by the counterclaim are not resolved. Rule 2-30, Rules of the Supreme Court of Indiana, is controlling, and reads as follows:

"Rule 2-30. Special Findings of Fact on Appeal. When special findings of fact are made in an action tried by the court without a jury and the court fails to find on some material issue of fact, on appeal from the judgment the reviewing Court may either affirm the judgment if it is supported by undisputed evidence, or vacate the judgment and remand the action for findings on the material issues of fact."

Appellee contends that as the burden of proving the material allegations of the counterclaim was upon defendant, the absence of a finding upon a material issue, is, in fact a finding against defendant-appellant. In support of this proposition, appellee cites: *Home Equipment Co., Inc. v. Gorham* (1941), 218 Ind. 454, 33 N. E. 2d 99.

The harshness in application of the rule which appellee contends as controlling has been alleviated by Rule 2-30, *supra*, which was in effect before the trial of this cause. *Wyatt v. Wyatt* (1960), 131 Ind. App. 1, 165 N. E. 2d 768; and, *Hutter v. Weiss* (1961), 132 Ind. App. 244, 177 N. E. 2d 339.

We may, under Rule 2-30, *supra*, either affirm the judgment of the trial court, if it is supported by undisputed evidence or remand the cause for further findings upon the material issues presented by defendant-appellant's counterclaim. *Hutter v. Weiss, supra.*

The material issues raised by the counterclaim and plaintiff-appellee's answer thereto, may be summarized as follows:

1. Was there an implied warranty that the potatoes would be reasonably fit for use as seed?

2. Was there a breach of the warranty occasioned by plaintiff-appellee's failure to deliver potatoes reasonably fit for use as seed.

3. If, in fact, there existed an implied warranty of fitness and a breach thereof, was the defendant damaged as a result of the breach and to what extent?

The burden of establishing the warranty of fitness, the breach of that warranty and damages arising therefrom, was upon defendant-appellant. As stated in Special Finding of Fact No. 4, *supra,* the court found an implied warranty to exist. However, in neither its original set of findings nor its supplemental findings, did the court indicate whether the warranty had been breached, nor did the court find the existence or non-existence of damages.

If the evidence is undisputed and leads to the conclusion that there was no breach of the warranty or that if there was a breach of the warranty, the defendant occasioned no damages as a result thereof, we must affirm the judgment of the trial court.

Upon a review of the record in this cause, we are of the opinion that there appears conflict in the evidence running to a breach of the warranty. It appears that defendant-appellant, Mullett, purchased and planted three varieties of seed potatoes in the Spring of 1961, Russet Sebago, White Sebago and Plymouth potatoes; that the Russet Sebago seed potatoes and Plymouth seed potatoes were purchased from plaintiff-appellee, Emme, and the White Sebago seed potatoes from one, Johnson; that the seed potatoes were delivered during the month of April and planted during the month

of May. It appears of record that during the period between the time of delivery and the time of planting, Mullett stored the seed potatoes by stacking them in two barns.[2] Mullett testified that at the time of delivery there were fifteen or twenty bags of Russet Sebago potatoes with wet spots apparent on the outside of the bag. Plaintiff, Emme, stated that he examined the Russet Sebago seed potatoes at planting time and they contained Fusarium Rot.[3] There is ample evidence of record that all of Mullett's 1961 crop of potatoes were planted in nearly the same type of soil and each variety received the same amount of fertilizer, insecticides, pesticides and irrigation per acre.

Mullett testified that he planted, side by side, in the same field, twenty-eight acres of the Russet Sebago seed potatoes obtained from Emme and fourteen and one-half acres of the White Sebago seed potatoes, purchased from Johnson. Emme testified on cross-examination that given the same growing conditions, there is very little difference in the yield of White and Russet Sebago potatoes.

Mrs. Mullett, who maintained the production records, stated that the fourteen and one-half acres of White Sebago potatoes, obtained from Johnson, yielded 260 bags per acre.[4] Mrs. Mullett further stated that the Russet Sebago seed potatoes, planted in the same field beside the White Sebago potatoes, yielded only 119 bags per acre.

The record reveals that in July of 1961, the stand of Russet Sebago potatoes was poor and the county agent's office obtained a sample thereof, which was sent to the Purdue Uni-

---

2. The only apparent difference in storage of the Russet Sebago seed potatoes and the storage of the White Sebago seed potatoes is that the Russet Sebago potatoes remained in storage for a longer period of time.

3. As appears from the record, Fusarium Rot is a disease of tubers caused by an organism which enters bruised potatoes. The disease may remain dormant during cold storage.

4. The term "bags", as was explained in the record, refers to one hundred (100) pound bags.

versity Plant Pathology Laboratory for analysis. A Mr. Fordyce tested the samples in the laboratory and by return correspondence, informed the county agent's office that the Russet Sebago potato samples contained Verticillium Wilt. There is evidence of record that during the entire growing season, the White Sebago potatoes were in good condition.

In way of defense to defendant-appellant's counterclaim, plaintiff-appellee called one, Robert Ridge, who testified that he purchased Russet Sebago seed potatoes from Emme in 1961 and received seed from the same shipment from which Mullett obtained his Russett Sebago seed potatoes. Ridge stated that he obtained a yield of 250 bags per acre from that Russet Sebago seed. However, on cross-examination of Ridge, it was pointed out that seed potatoes from the same shipment may have come from different farms.

Dr. Samson, Purdue Plant Pathologist, testified in behalf of plaintiff, by way of defense to the counterclaim, that he and Emme went to the Mullett farm on September 15, 1961, to look at the crop of Russet Sebago potatoes. At that time, Dr. Samson took samples of stems and tubers from the field back to Purdue for analysis. Dr. Samson indicated that he was at a distinct disadvantage at the time he ran his analysis because he had to work with dried stems. Dr. Samson testified that the Russet Sebago plants which he examined from the Mullett field contained Verticillium Wilt of the type that persists in the soil indefinitely, once introduced. He further stated that the samples contained bacterial soft rot, alternaria leaf spot, blackleg and blackheart. Dr. Samson stated that the latter four diseases arise as a result of insufficient nitrogen, oxygen, fungicides and pesticides. Upon cross-examination, however, Dr. Samson indicated that some of the diseases may have been latent at the time of delivery and developed during storage and during the growing season. Dr. Samson further testified that in his opinion, the defendant used less control measures on the 1961 crop than are normally used by potato growers generally.

As illustrated by the foregoing portions of the record, there appears a definite conflict in the evidence relating to the alleged breach of warranty.

The trial court, in its Special Finding No. 35, *supra,* found that the reduced yield of Russet Sebago potatoes was a result of inadequate ventilation of the seed potatoes during storage; the planting of seed potatoes infected with Fusarium Rot and blackheart; insufficient application of spray, fungicide and insecticide; Verticillium Wilt and bacterial soft rot. The court then stated:

> "[T]he extent to which each of these factors contributed to the size of the harvest was never established by the evidence."

In light of the dispute in the evidence and the court's ultimate decision in favor of the plaintiff and against the defendant upon the counterclaim, Finding No. 35 is susceptible of at least two possible intendments: First, that defendant-appellant has not sustained the burden of proving a breach of warranty and/or damages arising therefrom; or second, that defendant-appellant's contributory negligence served to preclude recovery upon the counterclaim.[5] Pursuant to his timely request, the defendant was entitled to a finding upon each of the material issues presented by the counterclaim and answer thereto, i.e., the basis for the court's ultimate decision.

For us to ascribe one of the above meanings to Finding No. 35, would be to decide the case and notify the appellant of the basis for denial of recovery in the trial court.

The intended function of the court's Finding No. 35 is not indicated and we are precluded from attaching a meaning

---

5. Although the language of Finding No. 35 sounds in "contributory negligence", we do not here lend credence to the proposition that contributory negligence constitutes a defense to a breach of warranty action. Such an issue is clearly not presented.

thereto by use of presumption, inference or intendment. *Kerfoot v. Kessener* (1949), 227 Ind. 58, 84 N .E. 2d 190; and *Kelly, Glover & Vale Inc., et al. v. Heitman* (1943), 220 Ind. 625, 44 N. E. 2d 981.

Such a pronouncement is the sole function of the trial court under Rule 2-30, *supra.*

Under Rule 2-30, *supra,* when the trial court has failed to find on some material issue of fact, this court is given two alternatives: We may either affirm the judgment, or vacate the judgment and remand the cause for findings on the material issues. However, defendant-appellant has asked for a new trial. Although cognizant of the language of Rule 2-30, *supra,* we feel that it is the purpose of that rule as well as all of the rules, to do justice in a particular instance. We feel that a new trial is the only proper solution here. The resolution of dispute in the evidence relating to the alleged breach of warranty and consequent damages involve solely a problem of assigning the proper weight and credibility to the testimony of witnesses.

The judge who originally tried this action no longer occupies the bench of the Steuben Circuit Court and to remand this cause for further findings to be made from cold print, would be to impose an impossible task upon the present judge.

As that portion of the court's judgment granting recovery to plaintiff-appellee upon his complaint is uncontested, it is hereby affirmed. The cause is remanded to the Steuben Circuit Court for a new trial upon the issues presented by defendant-appellant's counterclaim and plaintiff-appellee's answer thereto. The costs of this appeal are taxed against the appellant. The judgment of the Steuben Circuit Court is affirmed in part and vacated in part and remanded for a new trial.

White, J., not participating.

NOTE.—Reported in 248 N. E. 2d 178.