Pearl WEBER, William R. Weber and Wanda Weber, Appellants,

v.

L. O. MAGERS, Louwena Magers, and T. J. Walker, Sheriff, Stone County, Missouri, as Trustee, Respondents.

No. 52253.

Supreme Court of Missouri, Division No. 2.

Sept. 11, 1967.

J. Hal Moore, Bob J. Keeter, Moore, Pettit & Keeter, Aurora, for appellants.

Royle Ellis, Cassville, Joe C. Crain, Ozark, for respondents.

PRITCHARD, Commissioner.

The prayer of plaintiffs in this equity suit is for the cancellation of a note and deed of trust and for restoration of amounts paid on the note, $15,783.82, to plaintiffs. The note and deed of trust were given for the balance of the purchase price of a grocery store business and locker plant (the sale being consummated July 1, 1960) in Reed Springs, Missouri. After taking the case under advisement and permitting briefs to be filed, the court found the issues on Counts I and II of plaintiffs' petition against them and dissolved a temporary injunction (against foreclosure of the deed of trust, Count II).

The gist of the allegations of Count I of the petition is that to induce plaintiffs to purchase the businesses defendants falsely and fraudulently represented to them that the operation thereof grossed $120,000 per annum and that locker rentals alone were $3,000 per anum; that all locker plant equipment was in first-class condition and met all requirements of the State of Missouri so that immediate operation could be anticipated; that they would deliver a mailing list of customers for hickory smoked hams which would require as many as 300 hams to be processed and smoked at one time; that upon payment of $15,000 gross on their note plaintiffs' premises would be released from the second deed of trust; that the rental lockers were in full use by paying customers; and that all property was in perfect state of repair. Count II was for said injunctive relief against sale of the property secured by said deed of trust and from sale or transfer of the note secured thereby, pending a trial of the issues concerning the validity of the note. In general, the answers were denials of the allegations of the petition.

The sale of the building and business was for $57,300 initially, and plaintiffs paid $2,500 down ($500 cash and borrowing $2,000 more from Tommy Walker, the Sheriff). The note was drawn for $54,-800, and upon taking inventory of the stock of goods, first estimated at $12,000, a credit of $3,984.79 thereon was given by Magers.

In material respects of issues presented, plaintiffs' evidence tended to show that Pearl Weber was in defendants' store and one of them mentioned in the first part of June (1960) that they were wanting to sell the business. Upon remarking that she

would like a business (Pearl was a school-teacher) and her brother, Riley Weber, would like to come back from California, Pearl was later contacted by Mrs. Magers and asked to come to see Mr. Magers. "He wants to talk to you about buying the store." She told him they didn't have money to invest, and he told her it would not take very much. They talked three or four other times and she went back again and asked about the purchase price, the income from the store, about the condition of the property and everything that would have to do with being successful in the business. Her testimony was further that Magers wanted approximately $55,000 for the business, and that the business averaged a gross profit of $10,000 per month. He told her the property was in good condition; that he exhibited an electricity bill of $88 and said that was as high as it ever ran; that within a period of five years they could pay for the business and Riley and his family could live out of it, upon which representations she relied. She wrote these matters to Riley and in a few days he arrived in Reed Springs after which they talked with Magers three or four times, and he made the same statements he had previously made to Pearl alone. He told her they could afford to keep the lockers open which would produce an income of approximately $3,000 a year, and that it was in good working condition. Pearl worked in the business on weekends and most times after school. The first notice she had that the property was not in good condition was when the ceiling fell in the living room, and they had trouble with the drainage system until it was repaired in August, 1962. The largest annual gross from the business was $80,000. She and Riley asked Magers' permission to sell the lockers, which he gave and suggested it be used for cold storage to an individual who had offered him $700 per month. She asked him to release the farm from the deed of trust so they could borrow money to restock the business, but he refused. She mentioned to Magers every time they had trouble making a payment that the business

had never reached $10,000 a month, and he thought that it would do better after they had been there awhile, that they should keep trying and perhaps if they wanted to sell he could help find them a buyer. After they had paid Magers $15,000, she asked him to release the farm when she talked with him on the telephone on January 8, 1963, when he was in California, but he refused.

On cross-examination, Pearl stated that sometime in 1962 she wrote to Magers saying that business was not good for the weekend, "maybe saving up for Labor Day"; that they would need more time; that she thought perhaps they had their store problems solved; and she believed things were going to work out all right soon. She testified on deposition that she never made any complaints to Magers about his misrepresentations or the sale of the business. The store was closed on January 15, 1963, with some inventory left on the shelves after she had called Magers in California and told him that unless they could work out something satisfactory with him they would be forced to close the store because they could no longer pay the electricity bill and restock the shelves as they should be and carry on the business. Plaintiffs never did pay any taxes, and used the money for one half the taxes Magers had paid them. At the time they closed the taxes were about $1,500. One of the greatest wrongs Magers did her was that she was led to expect a better business than they had. Riley put in very little money; Pearl paid $500 down and borrowed $2,000 to make the total down payment. The main problem was that plaintiffs did not have enough working capital to keep a stock of groceries and liquor on the shelves. On re-direct examination, Pearl testified that she borrowed $8,000 or $10,000 to put in the business operation from the time it was purchased. Income tax records show it lost $4,554.77 in 1960; $5,376.72 in 1961; and $3,492.89 in 1962. The business was incorporated at the outset as "Shepherd of the Hills Market and Locker Plant." Pearl

drew a salary out of the store only a short time. Nothing was said about the farm as security until Riley had quit his California job and had come to Missouri. Magers then said, "Well, I guess you wouldn't mind putting your farm up for security." Pearl said, "Well, yes, I would, but if this is how you represent it, then I guess there'd be no danger of my losing it." How he represented it meant an income of $10,000 every month and everything was in good condition.

According to Riley Weber, upon being contacted by Pearl he quit his California job and came to Reed Springs where he and Pearl talked with Magers two or three times in negotiating the sale. There was the locker plant, store and fresh meat department and a liquor license involved. Magers told him two cabins in the rear of the premises were rented most of the time at $10 per week. He said the Webers would get $3,000 the first of May out of the locker plant, there being 350 lockers in it. Riley looked in some of them and found meat "and stuff." There was a card file with about 120 locker cards and Riley didn't check them very well at first. When he got into the plant there were approximately 20 lockers which were drawing rent. On the other lockers which had meat in there there didn't seem to be anyone available to claim the contents—no rent was being paid on them, and on closer inspection of a part he found packages of meat which had been there quite awhile—long enough to dry out completely.

Riley had never had any experience in operating a locker plant, a liquor store or a grocery store, but had worked a short time in a grocery store in the state of Washington checking and stocking shelves.

As to the condition of the locker plant, Magers represented to Riley that it was in good shape and ready to operate. Magers told him that he had a mailing list of ham customers which he would furnish and advise him of what season the most hams were needed. As to the true situation, Riley testified there were only the 20 lockers rented at $12 per year; they got a leak in the ammonia line and the cooling system broke down and they had to get it fixed. "Finally got it so it wasn't so bad." It cost $250 to have the locker plant repaired. Magers told him he had mailed 200 to 300 hams and bacon at Christmas time; that he had grossed $10,000 a month in the business; and that the Webers would have no trouble in paying for it in five years. After they got into business the gross averaged $5,000 per month. Riley discovered six missing meat trays in the attic catching leaks, and he had to find additional things to catch water a week or two after it started raining. He had to have the living quarters roof repaired, and the floors, except the kitchen and bathroom, had cardboard over subfloor. The drains were stopped up; the septic tank had collapsed and he replaced it, putting in new lateral lines; and also he put in a septic tank for the meat department. Magers told him the average electricity bill for the place ran about $80 per month, but their bills never ran under $100 and sometimes as high as $165 for electricity alone. He first complained to Magers in August (1960)—that they were not making enough the first part of the time to average out what they had to have to get $10,000 a month. It was taking it all to meet their obligations. Magers said, "Well, it's the season. Stay with it." The main thing, he said, was that if they would stick with it, he knew a buyer and would send him to them—just keep the business going. Magers told the Webers when they were negotiating to buy that after they had paid $15,000 (principal and interest) on the business he would release the farm. In January, 1963, Magers refused to release Pearl's farm, and the business was closed the latter part of January or the first of February. Riley was working in Springfield, Missouri, doing what he could to support the business. His wife and Fanna Belle Nickel were helping run it. He testified that the building was in considerably better condition in January,

1963, than it was in July, 1960, when they took possession of the property. He had repainted the cabins, replaced one ceiling, replaced the living quarters roof, replaced a septic tank for the living quarters, completed a new drainage system for the kitchen and a new tank for the butchering department, all at a cost of about $300. He asked Magers' permission to dispose of lockers, which was given, and he testified Magers was present when lockers were moved out.

On cross-examination, Riley testified that he looked at the living quarters two or three times and saw no wet plastering where water leaked and stained it—he saw just a crack. He prettty well looked over the interior of the plant and saw the coils covered with ice. He went into one cabin, but not the other. There was a compressor for the cooling room, and one for the dairy case; there was a cash register there; there were 350 lockers; the locker plant, machinery and equipment ran for about a year with help in repairing. The $8,900 stock of merchandise went for expansion, repairs and other stock, and he, his wife and three children lived out of it. He started to prepare the locker plant for bulk storage by making an outside entrance thereto through concrete blocks, but the door was never installed. He started to work in September, 1962, in Springfield, and his wife ran the store. The main problem all the way through was that they just didn't have enough working capital to keep a stock of merchandise in the place. He sold a compressor to Orr or Reynolds, and some locker units to different persons.

Clell McGinnis, State Dairy-Locker Inspector, testified there were no proceedings for condemnation or restrictions on the locker plant.

Leon Frederick testified he was at the business and locker plant after plaintiffs left, and the "interior of the plant was a mess." There were compressor parts on the floor, about 25 or 30 lockers in the freezer room, the living quarters were in run-down condition, with plaster off the walls and a broken stool.

George Orr testified he bought from Riley an evaporating unit from the chill room and a fan for $150, and resold it for $300. Johnny A. Holt bought six sections of frozen food lockers from Riley for $30.

Leonard Magers testified that with Johnny Workman he built the plant in 1947 and in 1949 bought out Workman. Magers' health failed from 1955 through 1959 and 1960. In 1960 he tried to sell it to a man from Kansas City and during those negotiations Pearl came in and told him she had heard he wanted to sell, and he told her he did. When Pearl talked with him there was no discussion about either his gross or net income; he did show her his 1959 income tax returns (showing a profit of $4,309.97). He denied telling Pearl that his operation grossed as much as $120,000 per year, and he did not remember discussing the locker rental average income. He didn't think she asked questions about whether or not the plant and equipment were in first-class condition, but she could have—she had been in the plant. There was no discussion about whether or not the butcher shop or meat operation was in first-class condition. His biggest item was curing hams, bacon and loins, October, November and December being the three biggest months. There was no discussion about furnishing mailing lists of customers for hickory smoked hams, but he did leave a list with the Webers. In 1959 he had 689 smoked ham and bacon customers. Prior to the time he consummated the transaction, before he took the note and mortgage, nothing was said by him about releasing the mortgage and Pearl's 160-acre farm when $15,000 was paid. There was nothing asked about whether the property was in perfect state of repair—he had not had any trouble with it. At no time after the transaction was closed did plaintiffs complain to him about misrepresenting the buildings or business or anything about it. He did not at any time discuss with

Riley any permission to sell equipment, the furniture, or fan, and first knew of the removal of various articles of equipment in January, 1963, when he returned from California. He then found the lockers gone, a hole cut in the north side of the building, the meat and display cases were all gone but one, the National Cash register was gone, one set of computing scales was gone, and there was only $30 worth of groceries on the shelves. He gave the Webers $72.48 for one half the taxes for 1960; the land was advertised for a tax sale and he paid $221.50 to prevent it. From 1961 through 1965 total taxes due amounted to $1,555.19 county and state and $991.70 to the city of Reed Springs. The cost of restoration of the building (to its previous condition) in 1963 was in his judgment $26,000.

Magers denied telling Tommy Walker (who so testified) that he was going to release the farm after he received $15,000 from plaintiffs, or making the statement to anybody that the property when he had it grossed $10,000 per month, or that any person trying to buy it could pay for it within three to five years.

 Upon proof clear and convincing to the court, plaintiffs might prevail upon their allegations of misrepresentation of present facts which induced them to enter into the contract of sale. Goar v. Belinder, 213 Mo.App. 330, 249 S.W. 977, 980; Strafer v. Bodney, Mo., 247 S.W.2d 630, 635; Wendell v. Ozark Orchard Co., Mo. App., 200 S.W. 747; Luchow v. Kansas City Breweries Co., Mo.App., 183 S.W. 1123. The plaintiffs' case rests, however, upon proof of their allegations that Magers misrepresented to them that his operation had grossed $10,000 per month; that he would (intending not to) release the farm from the deed of trust when the plaintiffs had paid $15,000; that the building and equipment were in good condition; that the lockers would produce $3,000 per year; and other facts were sharply controverted by the parties. Their testimony was diametrically opposed upon these issues vital to plaintiffs' case. The matter of proof here initially turns upon the trial court's ability and superior position to adjudge the credibility of the parties and other witnesses testifying. In this review deference must be accorded to the trial court's opportunity to adjudge such credibility. Sloan v. Dunlap, 354 Mo. 1211, 194 S.W.2d 32; Gardine v. Cottey, 360 Mo. 681, 230 S.W.2d 731; Ragan v. Schreffler, Mo., 306 S.W.2d 494. But in considering this record as a whole, it is apparent, aside from the fact that Magers made no misrepresentations concerning his business so as to induce plaintiffs to purchase it, that their difficulties were brought about by their own mismanagement and their admitted lack of capital to keep the business adequately stocked. The trial court's judgment is not against the overwhelming weight of the evidence, and should not be disturbed. Sebree v. Rosen, Mo., 349 S.W.2d 865.

The judgment is affirmed.

BARRETT and STOCKARD, CC., concur.

PER CURIAM.

The foregoing opinion by PRITCHARD, C., is adopted as the opinion of the Court.

All of the Judges concur.