Frank L. RAMACCIOTTI, Appellant,

v.

JOE SIMPKINS, INC., Joe Simpkins, Mildred U. Simpkins, Mound City Finance Company, a corporation, Hannibal Auto Sales & Investment Company, a corporation, and Hannibal Motors, Inc., Respondents.

No. 51496.

Supreme Court of Missouri, Division No. 2.

May 13, 1968.

Roberts P. Elam, St. Louis, for plaintiff-appellant.

Carroll J. Donohue, James E. Chervitz, Husch, Eppenberger, Donohue, Elson & Cornfeld, St. Louis, for defendant-respondent, Joe Simpkins, Inc.

Hinkel & Carey, Henry C. Hinkel, Harold D. Carey, Clifford L. Goetz, W. Scott Pollard, St. Louis, for respondents-defendants, other than respondent-defendant, Joe Simpkins, Inc.

STOCKARD, Commissioner.

Plaintiff, Frank Ramacciotti, has appealed from the judgment of the circuit court of the City of St. Louis entered in favor of all defendants in his suit in equity in the nature of a corporate stockholders derivative action in which he sought an accounting against all defendants, except Joe Simpkins, Inc., and the appointment of a receiver to liquidate Joe Simpkins, Inc., and to distribute its assets.

Plaintiff has abandoned on this appeal several issues, including whether a receiver should be appointed, because no point pertaining thereto is set forth in his brief to this court. State ex rel. Plymesser v. Cleaveland, Mo., 387 S.W.2d 556. We review the case de novo, weigh the evidence, and determine on the whole record the relief, if any, to which plaintiff is entitled. The trial court made no findings of fact, but entered a general judgment for defendants. Therefore, it necessarily found the fact issues in their favor. Because of the opportunity of the trial court to observe and hear the witnesses, in our determination of the facts from conflicting testimony we defer to the findings of the trial court. McCarty v. McCarty, Mo., 300 S.W.2d 394, 399. The transcript exceeds 10,000 pages and contains more than 1200

exhibits. Much of this pertains to abandoned issues. Rather than laboriously set forth in detail the conflicting evidence in support of the positions of the parties, we shall for the most part set forth the ultimate facts, as we have found them, essential to the determination of the issues.

Plaintiff's first point, hereafter more specifically set out, pertains to numerous transactions whereby Joe Simpkins, Inc., purchased repossessed automobiles from two finance companies. However, preliminary to the consideration of the point, it is necessary to set forth in considerable detail a statement of the ownership and methods of operation of Joe Simpkins, Inc. and of several other corporations.

Plaintiff was employed in 1946 by Joe Simpkins (hereafter referred to as Mr. Simpkins to distinguish him from Joe Simpkins, Inc.) in a tax matter involving Mr. Simpkins personally, Mr. Charles Sakowski, and Mound City Finance Company. This employment continued until 1958 when the tax matter was concluded. In 1947 Mr. Simpkins acquired one-half interest in Irving Motors, Inc. Mr. Fred Evens was the owner of the other half. Shortly thereafter the name of the corporation was changed to Joe Simpkins, Inc., and an agency franchise was acquired from the Ford Motor Company. Although plaintiff had no experience in the new or used automobile business, at the invitation of Mr. Simpkins, plaintiff purchased one third of the stock of Joe Simpkins, Inc. and paid Mr. Simpkins and Mr. Evens each $16,666.67. Plaintiff testified that he associated himself in the business because he "figured [he] could contribute some judgment and management ability." He immediately was elected a director and named assistant secretary-treasurer. In 1950 following some litigation, the one-third interest of Mr. Evens was purchased by Joe Simpkins, Inc. for $140,000 plus reimbursement of $8,000 litigation expenses. The stock formerly owned by Mr. Evens thereafter remained as treasury stock. Plaintiff and Mr. Simpkins were then equal owners of the outstanding stock. The directors were plaintiff, Mr. Simpkins and the latter's wife. Mr. Simpkins remained as president, his wife was vice president, and plaintiff became secretary-treasurer. In August 1956, Joe Simpkins, Inc. surrendered its franchise from the Ford Motor Company, and sold its business, equipment, furniture and fixtures to Mr. George Pappas. Thereafter, the principal business of the company consisted of disposing of automobiles on hand and those repossessed, and the liquidation of its accounts receivable. In 1958, following a merger with Joe Simpkins, Inc. of four investment companies, mentioned hereafter, additional shares of stock were issued and the wife of Mr. Simpkins became the owner of some shares, but plaintiff continued to own one-half of the total outstanding shares. On November 9, 1961, at a meeting of the board of directors called by Mr. Simpkins, plaintiff was removed from the office of secretary-treasurer, but he remained a member of the board of directors. Mr. Simpkins was elected treasurer in addition to being president, and an employee of his was elected secretary. At the time this suit was filed in November 1961 the assets of Joe Simpkins, Inc. consisted of an unliquidated account receivable, doubtful of collection, of $41.90; approximately $187,-000 in a checking account in a Wellston, Missouri bank; negotiable bonds in excess of $200,00; more than $73,000 of secured and unsecured notes not then due and payable; several thousand dollars of accrued interest; and the claims on behalf of Joe Simpkins, Inc. asserted by plaintiff in this suit. The liabilities amounted to $348 for income taxes payable, and a disputed claim by plaintiff for $21,000 for services.

Ford Center Investment Company, Precision Investment Company, Discount Investment Company, and Hanscom Investment Company (hereafter referred to as the "investment companies") were each equally owned by Mr. Simpkins and plaintiff, with the former being president and plaintiff being treasurer of each. These

corporations were engaged primarily in the financing of new automobiles sold by Joe Simpkins, Inc. They operated from the office of Joe Simpkins, Inc., but at times some of their business was handled from the office of Mound City Finance Company. In April 1958, as above noted, they were merged with Joe Simpkins, Inc.

Mound City Finance Company (hereafter referred to as "Mound City") was owned by Mr. Simpkins and Mr. Charles Sakowski, the former owning 75% of the stock and the latter owning 25%. Mr. Sakowski is a brother-in-law of Mr. Simpkins, and was manager of Mound City. Mr. Simpkins was president and treasurer, and he, his wife, and Mr. Sakowski were the directors. By reason of plaintiff's employment as attorney in the tax matter involving Mr. Simpkins, Mr. Sakowski, and Mound City, and because plaintiff wrote the corporate minutes for Mound City after 1947 and until 1957, and acted as its attorney in some matters, there can be no question but that at all times material to the issues here he was fully aware that Mr. Simpkins was the principal owner of Mound City, and that he was an officer and director thereof. Mound City financed the sale of used automobiles by Joe Simpkins, Inc. It was first located at 4454 Easton, St. Louis, where Mr. Simpkins operated a used car business, and for awhile after first engaging in business Joe Simpkins, Inc. operated from its office. Later Joe Simpkins, Inc. moved to 6421 Easton, and in 1951 Mound City leased a portion of the building of Joe Simpkins, Inc. for its office where it operated until after the sale to Mr. Pappas.

Hannibal Auto Sales & Investment Company (hereafter referred to as "Hannibal Investment") was engaged in the same business as Mound City. It was owned by Mr. Simpkins and his wife. Mr. Simpkins was its president and he, his wife and Mr. Sakowski were the directors. In the latter part of 1952 it moved its office and place of business into the office occupied by Mound City and Mr. Sakowski managed its business.

In 1947, and for several years thereafter, there existed in the automobile business what was known as a "seller's market." When Joe Simpkins, Inc. first started operations it was with the plan to become a "volume dealer" of new automobiles, that is, an automobile dealer who sold a large number of automobiles with liberal trade-in allowances and with favorable financing, at least from the buyer's standpoint. It was recognized that to do this it would be necessary to attract buyers from areas other than Wellston, Missouri, the place of operation of Joe Simpkins, Inc., by advertising, publicity, and favorable "deals."

When a new automobile was sold on credit, a note secured by a chattel mortgage (referred to in the testimony as "new car paper") would be prepared for the amount of the unpaid purchase price. This note would be sold to one of the investment companies, which in turn would discount it to a bank or to an automobile financing agency known as GFC. At least some of the notes in this "new car paper" were endorsed without recourse, but apparently most were endorsed with recourse. In addition, there was an arrangement whereby Mr. Simpkins and plaintiff personally guaranteed these notes, at least to the banks and GFC. When a note became in default, the investment company repurchased the note, and if a repossession was required the automobile was picked up and placed on the used car lot of Joe Simpkins, Inc., and after notice to the maker of the note the automobile was sold as a used automobile.

A used automobile was usually obtained by Joe Simpkins, Inc. as a "trade-in" when either a new or another used automobile was sold. For awhile after Joe Simpkins, Inc. started operations most of the used automobiles were sold to another automobile dealer at a "wholesale figure." Joe Simpkins, Inc. later sold the used automobiles at retail, and at least four used car lots were operated at various times.

When Joe Simpkins, Inc. first started its operations almost all of the used cars taken in on trade were what were called "pre-war cars." When one of these was sold by Joe Simpkins, Inc. at retail, with plaintiff's knowledge and agreement the "used car paper" was sold to Mound City without recourse. Later "used car paper" on all sales of used automobiles was sold to Mound City, and in the words of plaintiff, "we [Mr. Simpkins and plaintiff] agreed with Mound City we would sell [the "used car paper" on] cars to them with recourse, and Mr. Simpkins and [plaintiff] guaranteed the Mound City from loss, because we weren't able to sell [the paper on] those cars, the banks wouldn't accept [the paper on] those cars, and the [paper on the] cars we sold to our own investment companies went through the banks." Starting sometime in 1953 some of this "used car paper" was sold to Hannibal Investment with the consent of plaintiff. Apparently plaintiff and Mr. Simpkins were never called upon personally to make good any loss to Mound City, although losses did occur. However, according to plaintiff, the personal liability of Mr. Simpkins and of him "was a consideration" or a "basis" for their compensation from Joe Simpkins, Inc. Their "compensation was not merely for services, but for guaranteeing that paper."

Essential to the operations of a "volume dealer" was the ability to finance the sales of the used automobiles which were acquired. According to Mr. Simpkins and Mr. Leber, the sales manager of Joe Simpkins, Inc., Mound City and Hannibal Investment afforded to Joe Simpkins, Inc., what is known as "mine-run" financing. This meant that by an express agreement or by an understanding the finance company would purchase all "used car paper" without questioning the amount of the note, the term provided for payment, or the credit risk. Plaintiff admitted that he had heard the term "mine-run" used in reference to the financing of the sale of used automobiles, but he denied that he knew what the term meant. However, there is no question that Mound City, and later Hannibal Security, did provide "mine-run" financing to Joe Simpkins, Inc. for the sale of used automobiles, and from a consideration of the evidence and the circumstances we find that the arrangement between Joe Simpkins, Inc. and Mound City, and subsequently with Hannibal Investment, for "mine-run" financing was entered into with plaintiff's full knowledge, understanding and agreement.

Plaintiff testified that in August 1953 he made an objection to the endorsement of the notes in the "used-car paper" with recourse and to the continuation of the guaranty agreement in favor of Mound City. The minutes of a special meeting of the directors of Joe Simpkins, Inc., dated August 4, 1953, not only reflect this objection but purport to state that the practice was to be discontinued. However, there is considerable question concerning the validity and accuracy of these minutes which were prepared by plaintiff at some time subsequent to the alleged meeting. Mr. Simpkins emphatically denied that any such meeting occurred or that the subject matters mentioned in the mintues were discussed at any meeting. One circumstance particularly impeaching these minutes is that although they recite recent action purportedly taken by the board of directors of Mound City, the minutes of Mound City do not reflect any such action. Another impeaching circumstance is that after August 4, 1953 and until the sale to Mr. Pappas in 1956, the practice of Joe Simpkins, Inc. of selling "used car paper" to Mound City and Hannibal Investment on a "mine-run" basis with recourse continued unchanged, and in view of plaintiff's activities, hereafter noted, and the information from both Joe Simpkins, Inc. and Mound City which was furnished and made available to him, the practice could not have continued without his knowledge.

Because of the less stringent credit requirements imposed by Joe Simpkins, Inc.,

there resulted a substantial number of repossessions of automobiles by Mound City and by Hannibal Investment. The automobiles were placed on a used-car lot of Joe Simpkins, Inc. and were identified by distinctive stickers placed on the windshield. Notice of sale pursuant to the chattel mortgage was sent by the repossessing finance company to the owner. When not redeemed the automobiles were sold by the finance company, and invariably Joe Simpkins, Inc. was the purchaser. Salesmen of Joe Simpkins, Inc. then sold these repossessed automobiles, and frequently this second sale was financed through Mound City or Hannibal Security. Joe Simpkins, Inc. did not buy repossessed automobiles from either Mound City or Hannibal Finance after the sale to Mr. Pappas in August of 1956.

Mr. Simpkins testified that after Mound City started to repossess automobiles he discussed with plaintiff the "recourse arrangement" between Joe Simpkins, Inc. and Mound City, and he stated to plaintiff that although Mound City would have the option to insist on full recourse, "it would be handled on a basis that if the profits to Mound City were satisfactory, that Mound City would not hold [Joe Simpkins, Inc.] to the * * * full recourse agreement." According to Mr. Simpkins, plaintiff said this procedure was "perfectly satisfactory." Mr. Simpkins further testified that automobiles repossessed by Mound City and Hannibal Security were allowed to accumulate, and that once or twice a month he would determine the price to be paid by Joe Simpkins, Inc. for the repossessed automobiles, and that in doing so he would take into consideration the "overall picture" which included the earnings of Mound City. Although plaintiff denied in his testimony that he had any knowledge whatever of these purchases by Joe Simpkins, Inc. from Mound City and Hannibal Investment, Mr. Simpkins testified that on "many occasions" when Mr. Sakowski told him that a number of repossessed automobiles were on hand, he and plaintiff would go to the office of Mound City, look at and discuss the "repossession cards" which contained the information concerning the automobiles, and they would "discuss the number of them, the amount that was paid by Joe Simpkins, Inc. for them," and sometimes they would discuss "the problems that were attached to them." Mr. Simpkins also testified that "many times" he and plaintiff were on the used car lot where the repossessed automobiles were stored, and that he and plaintiff "talked about the number of cars," the "condition of them," "how far we might go in reconditioning and working on them" to prepare them for sale, and that "sometimes we would just conclude * * * this one should be painted or this one needed a little more dollying up, or touching up or things of that nature." The testimony of the bookkeeper for Mound City confirmed the testimony of Mr. Simpkins that plaintiff frequently examined the "repossession cards" in the office of Mound City, and Mr. Leber testified that plaintiff visited the used car lot where the repossessed automobiles were stored, and that discussions were had concerning them.

If the price determined by Mr. Simpkins and paid by Joe Simpkins, Inc. to the finance company for a repossessed automobile did not equal or exceed the unpaid balance due from the purchaser, the note and mortgage were retained by the finance company and it would bring suit on these notes to recover the balance remaining unpaid. In many cases recoveries were made. These suits against the makers of the notes were brought by the same attorneys who represented the four investment companies in the collection of their accounts. These recoveries were not paid to Joe Simpkins, Inc. but were retained by the finance company. In our examination of the record we do not find a clear and unequivocal statement that the procedure above outlined for the purchase by Joe Simpkins, Inc. of automobiles re-

possessed by Mound City and Hannibal Security was or was not followed in regard to repossessed automobiles originally sold by Joe Simpkins, Inc. and financed through one of the four investment companies. After describing the procedure outlined above, Mr. Leber stated that repossessed automobiles "from banks" (referring to automobiles financed through the four finance companies) were handled "in much the same way." An auditor employed by plaintiff testified that he did not check the records pertaining to purchases by Joe Simpkins, Inc. from the investment companies because plaintiff owned half of Joe Simpkins, Inc. and half of each investment company, and if Joe Simpkins, Inc. lost on the transactions it would, as far as plaintiff was concerned, be taking money out of one pocket and putting it in the other. The implication is very strong that the procedure above outlined was followed in regard to repossessions of automobiles financed through the investment companies.

The operation of Joe Simpkins, Inc. was extremely successful from a financial standpoint until about 1955. Thereafter Joe Simpkins, Inc. lost money until the business was sold to Mr. Pappas. Plaintiff's explanation at the trial of the lack of objections on his part at the time to those methods of operation which he admitted he knew about was that he "didn't make an issue about those things in the earlier years, because in fact, I never did make an issue about things. I was quite agreeable."

By his first point plaintiff contends that Mr. Simpkins and his wife, as directors and "principal officers" of Joe Simpkins, Inc., occupied a fiduciary relationship to Joe Simpkins, Inc. and to plaintiff, its other stockholder, which precluded them from directly or indirectly, through Mound City and Hannibal Investment Company, profiting by virtue of that relationship at the expense of Joe Simpkins, Inc., and therefore, the trial court erred in failing and refusing to re-

quire Mr. Simpkins and his wife and the named corporations to account for the benefit of Joe Simpkins, Inc. for profits realized by them and losses suffered by Joe Simpkins, Inc. from the transactions in which Mound City and Hannibal Investment (1) "sold to defendant Joe Simpkins, Inc., vehicles which they had repossessed," and (2) "brought suits, and made recoveries upon notes secured by chattel mortgages upon vehicles repossessed by them and sold by them to defendant Joe Simpkins, Inc."

The only testimony that Mound City and Hannibal Investment made money or that Joe Simpkins, Inc. suffered a loss resulting from the purchases of repossessed automobiles from Mound City and Hannibal Security was that of Francis Linek, an auditor employed in 1957 by plaintiff, and who formerly had worked for the investment companies and some insurance companies, which will be mentioned later. He estimated a loss to Joe Simpkins, Inc. of about $69,000. We shall for the purposes of this opinion assume that some loss occurred.

■■■ It is the uniform rule that a director or officer of a corporation occupies fiduciary relation to the corporation and its shareholders. Since he occupies this relation he may not profit personally by virtue thereof at the expense of the corporation or the stockholders. If by dealing with the property or business of the corporation for his own purposes, he derives a personal profit from it, he may he held to be a trustee ex maleficio, as to such profits, for the benefit of the corporation and those stockholders who have suffered injury, and may be compelled to restore what he has thus converted for his own use. Bromschwig v. Carthage Marble & White Lime Co., 334 Mo. 319, 66 S.W.2d 889; Pepper v. Litton, 308 U.S. 295, 60 S.Ct. 238, 84 L.Ed. 281; Swafford v. Berry, 152 Colo. 493, 382 P.2d 999. Where it appears that a director or officer has obtained any personal profit from dealing with the corporation, and

the transaction is drawn into question as between him and the stockholders of the corporation, the burden is upon the director or officer to show that the transaction has been fair, open and in the utmost good faith. Geddes v. Anaconda Copper Mining Co., 254 U.S. 590, 41 S.Ct. 209, 65 L.Ed. 425. These rules apply equally as well where the director or officer has acted in his dealings with the corporation through another corporation of which he is the principal owner or is in control, Corsicana National Bank of Corsicana v. Johnson, 251 U.S. 68, 40 S.Ct. 82, 64 L.Ed. 141, and especially is this true where a common director or officer is dominating in influence or in character. Geddes v. Anaconda Copper Mining Co., supra. However, these rules are subject to certain qualifications. The relation alone of a director or officer of a corporation does not *prevent* the director or officer from doing business with the corporation at a profit. Swafford v. Berry, supra. The prohibition encompassed in the above general rules is directed at unconscionable and secret profits. Bromschwig v. Carthage Marble & White Lime Co., supra. "Stockholder's suits on behalf of a corporation are entertained only in *equity* * * * and equity has always demanded certain minimum standards of those who seek relief in its forum. Thus, we find it is the general rule that a shareholder who, with knowledge of the material facts, has consented or acquiesced in the transaction of which he complains ordinarily cannot attack the transaction on behalf of the corporation." Swafford v. Berry, supra. See also Johnson v. King-Richardson Co., 1 Cir., 36 F.2d 675, 67 A.L.R. 1465; Goddard's Ltd. v. Bank of Nova Scotia, D. C., 255 F.Supp. 58; Hill Dredging Corp. v. Risley, 18 N.J. 501, 114 A.2d 697; Miller v. Ortman, 235 Ind. 641, 136 N.E.2d 17; Keystone Copper Mining Co. v. Miller, 63 Ariz. 544, 164 P.2d 603; Annotation, 16 A.L.R.2d 467; 13 Fletcher Cyclopedia of Corporations § 5862; 19 Am.Jur.2d Corporations § 552.

Before we apply the above principles to the facts of this case, certain additional facts are helpful to a complete understanding of the total operations of Mr. Simpkins and plaintiff.

Before Mr. Simpkins acquired an interest in the corporation later known as Joe Simpkins, Inc., he operated Western Motor Sales, a used car business, at 4454 Easton Avenue in St. Louis, and he also operated Mound City from the same location. Plaintiff said Mound City was "existing in connection with it." Joe Simpkins, Inc. operated from the office of Mound City for awhile and used the facilities of plaintiff's used car business, apparently without charge. After Joe Simpkins, Inc. moved to 6421 Easton Avenue, Mound City leased the eastern portion of its building, and in 1952 Hannibal Security moved into Mound City's office. The four investment companies operated from the office of Joe Simpkins, Inc., or Mound City. Mr. Sakowski, the manager of Mound City, took care of some or all of their accounts until a Mr. Bruce was employed. According to plaintiff, Mr. Bruce worked for Mound City, the "motor company" (apparently referring to Joe Simpkins, Inc.), and the four finance companies. We cannot ascertain from the record from which corporation or corporations he received his pay.

In 1947 plaintiff and Mr. Simpkins formed Guaranty Investment Company, and at least after Mr. Evens sold his interest in Joe Simpkins, Inc., plaintiff and Mr. Simpkins were its sole owners. In addition, there were companies known as Guaranty Insurance Exchange, Guaranty Underwriters, Inc., Insurance Agency Management Company, Colonial Insurance Company, and Mid-Continent Insurance Company. All of these companies operated from the office of Joe Simpkins, Inc., and were owned equally by Mr. Simpkins and plaintiff, except possibly the last two and the ownership of them was not shown in the record, or at least we did not find it. It was through these companies that insur-

ance was sold on automobiles sold by Joe Simpkins, Inc. Mr. Simpkins and plaintiff also formed and equally owned Joe Simpkins Leasing Company. It operated, at least to some extent, from Joe Simpkins, Inc. Mr. Simpkins was president and plaintiff was treasurer.

Plaintiff and Mr. Simpkins owned some real estate "together equally," at least some being held in the name of a straw party, including a used car lot and the building from which Joe Simpkins, Inc. operated. There was also an "oil partnership" pertaining to investments in three states, but this partnership does not appear to have been a material part of the overall operations of Joe Simpkins, Inc.

The total of these operations was extremely profitable to plaintiff. His salary from Joe Simpkins, Inc. up to the time of the sale to Mr. Pappas was $178,000. The real estate at a partition sale brought "something like $265,000." Plaintiff's interest in the various corporations when sold was at least $464,500. From one phase of the "oil partnership" plaintiff had realized "in excess of $500,000," and he was at time of trial receiving from it "a couple of thousand a month." We point out these activities of Mr. Simpkins and plaintiff to demonstrate that the activities of Joe Simpkins, Inc. was not a single operation, but that the corporation was an integral part of a total operation which was financially successful, and which included at least nine and possibly more corporations in which plaintiff and Mr. Simpkins owned an interest. Their activities also included the joint ownership of real estate, a partnership, and at least two corporations in which plaintiff owned no stock.

 Mr. Simpkins was the principal officer and a director of Joe Simpkins, Inc., Mound City, and Hannibal Investment. He may properly be termed as dominating in influence in each of these corporations. Mr. Simpkins was in a fiduciary relation to Joe Simpkins, Inc., and also to plaintiff, who at the time of the transactions

challenged by plaintiff's first point was the only other stockholder. This relationship imposed upon him the duty not to profit by that relationship by reason of secret transactions with Joe Simpkins, Inc., or, stated another way, not to profit by transactions with Joe Simpkins, Inc. which were not accompanied by a full and fair disclosure to plaintiff of the material facts. The essential and determining issues for our determination are of fact, and as previously noted, by reason of its general judgment, the trial court found the fact issues in favor of defendants. The issues of plaintiff's knowledge of the material facts pertaining to the purchase by Joe Simpkins, Inc. of used automobiles repossessed by Mound City and Hannibal, and his acquiescence in these transactions, are areas in which there is a substantial dispute in the oral testimony. Unless from our examination of the record we are compelled to conclude that these findings are clearly erroneous, Long v. Kyte, Mo., 340 S.W.2d 623, we are to defer to the findings of the trial judge who heard the evidence and observed the witnesses. Weber v. Magers, Mo., 417 S.W.2d 946. It is our conclusion from a careful and detailed study of the record that the trial court correctly found these facts. At the calculated risk of extending this opinion to an unreasonable length, we shall set forth facts and circumstances which compel us independently of the rule of deference to reach the same factual result as did the trial court.

From the time plaintiff purchased his interest in Joe Simpkins, Inc., he was a director and an officer. He was present at the place of operations, at least after Mr. Evens left in 1950, almost every day. His duties and activities, by his own admissions, occupied a majority of his time and included being "in charge of the books and records of the company," and to determine with Mr. Simpkins "all major policies of the company." For the performance of these and other duties he accepted as salary from Joe Simpkins, Inc. a total of $178,-000, starting in the latter part of 1947 and ending in the early part of 1954. Plain-

tiff knew that used automobiles were being sold to persons who could not buy any place else on extremely liberal terms, that Mound City and Hannibal Security were buying the "used car paper" on a mine-run basis with recourse, and that he and Mr. Simpkins were personally guaranteeing that "paper," at least to Mound City. Plaintiff also knew that in this type of an operation there necessarily would be a substantial number of repossessions, and that they would have to be handled or disposed of some way. What should be done about the automobiles repossessed by Mound City and Hannibal Security, in view of the recourse feature in the "used car paper" and the personal guaranty, unquestionably called for a "major policy" determination, and the testimony of Mr. Simpkins, and others clearly establish that plaintiff participated in this determination of policy concerning the handling and disposition of these automobiles. We are not impressed with plaintiff's denials that he knew anything about how these repossessed automobiles were handled, nor with his denial that he knew Joe Simpkins, Inc. was purchasing them. The transactions were openly carried out, they were revealed on the books and records of the company of which plaintiff was "in charge," and the essential facts were contained in reports and information from Joe Simpkins, Inc. and Mound City regularly furnished to plaintiff. The automobiles were stored in open view on a lot of Joe Simpkins, Inc., they were clearly marked, and plaintiff regularly visited the lot. Had plaintiff been performing the duties for which he accepted a substantial salary, he had to have been fully aware of the material facts of these transactions. See Mutual Life Insurance Company of New York v. Mooreman, 9 Cir., 366 F.2d 686, 690. The testimony convinces us that the number of such purchases, the prices paid by Joe Simpkins, Inc., and the handling of the automobiles were regularly discussed by Mr. Simpkins and plaintiff, and that plaintiff was fully aware that the automobiles repossessed by the finance companies were being purchased by Joe Simpkins, Inc. at prices determined by Mr. Simpkins.

It is immaterial that on some of these individual transactions Joe Simpkins, Inc. subsequently sold the automobile for less than Mr. Simpkins previously had determined should be paid to Mound City or Hannibal Security. There is nothing to indicate that this was a planned procedure, or that there was any fraudulent intent. In a proceeding such as this, plaintiff is not entitled several years later to seize on what in his "hindsight" he considers to have been a mistake of judgment. Mr. Simpkins's duty was to be fair, open, and reasonable in engaging in these transactions; not to be infallible in his judgment as to the value of each and every used automobile for which he determined the purchase price.

For the reasons above set forth we conclude that the defendants have met their burden of proof to establish that the transactions involving the purchase by Joe Simpkins, Inc. of the automobiles repossessed by Mound City and Hannibal Security were with the knowledge of plaintiff of the material facts, and with his consent and acquiescence, and that those transactions were not attended with unfairness or fraud.

We turn now to the second part of plaintiff's first point, that he is entitled to have Mound City and Hannibal Security account to Joe Simpkins, Inc. for the recoveries made by them upon notes secured by chattel mortgages upon automobiles repossessed by them and then sold to Joe Simpkins, Inc.

As previously noted, when an automobile was repossessed and sold to Joe Simpkins, Inc., the note was credited with the price paid. If this did not pay the balance remaining due on the note, and usually it did not, the finance company retained the note and in some cases brought suit and recovered part or all of the balance. We are not able to determine from plaintiff's

point, or from his argument, why he contends that Mound City and Hannibal Security should account to Joe Simpkins, Inc. for these collections made on these notes except on the basis that the whole of the transactions were wrongful, and we have held that they were not. In his brief he says that it is "plain and clear" that Joe Simpkins, Inc. should have received such notes and mortgages at the time it purchased the automobiles "to enable it to recover any deficiency resulting from the nonpayment in full by the makers of such notes."

Plaintiff does not contend that when the notes were originally sold to Mound City or Hannibal Security, Joe Simpkins, Inc. was not paid for them or that the amounts received were not proper amounts. Joe Simpkins, Inc. received the sale price of the automobile less the discount allowed on the note, and the finance company, the legal owner of the discounted note, was therefore entitled to all payments to be made thereon. There is no contention that when the repossessed automobile was purchased by Joe Simpkins, Inc. it also purchased the note. Under plaintiff's theory, after Joe Simpkins, Inc. received full payment for the automobile by discounting the note, it was also entitled to recover from the finance company some of the money collected by it in payment of the note. We find no basis for this contention. In fact, Joe Simpkins, Inc. received a benefit by these collections by the finance company, because such sums reduced the recourse liability of Joe Simpkins, Inc., and under the circumstances that was all to which it was entitled. We find no merit to the second part of plaintiff's first point.

Plaintiff's second point is that the trial court erred in failing to require Mr. Simpkins, his wife, and Hannibal Motors, Inc. to account for profits realized by them and losses sustained by Joe Simpkins, Inc. (1) "from the transactions in which the defendant Hannibal Motors, Inc. purchased vehicles from the defendant Joe Simpkins, Inc.," and (2) "from the transactions in which * * * Hannibal Motors, Inc., utilized the facilities—used car lots and services of salesmen and other personnel—of * * * Joe Simpkins, Inc. for the sale of vehicles purchased by * * * Hannibal Motors, Inc. from * * * Joe Simpkins, Inc."

Hannibal Motors, Inc. was owned by Mr. Simpkins alone, or with his wife possibly having some interest. It was previously a franchised Ford dealer in Hannibal, Missouri, but that franchise was given up in 1952, and thereafter its business consisted principally of being the owner of the building where it formerly operated.

Ford Motor Company registered several complaints to Joe Simpkins, Inc. about it carrying a large inventory of used automobiles. Mr. Simpkins testified that he discussed with plaintiff how they could retain the inventory of used automobiles but still satisfy Ford. An accounting firm advised them that they could set up another corporation and transfer the excess inventory of used automobiles to it, but it further advised that the "bureau" (apparently the Bureau of Internal Revenue) could construe this action as being done for the purpose of channelling some of the profits of Joe Simpkins, Inc. into another company. Bross Motor Company and Thom Motor Company were formed, the name of the latter being changed later to Discount Investment Company. Thom Motor Company operated a used car lot for awhile under the management of Tom Ramacciotti, plaintiff's son, and used automobiles were sold to it by Joe Simpkins, Inc. The exact status and operations of these two companies are not entirely clear from the record. In 1953, according to Mr. Simpkins, he and plaintiff discussed the "possibility of severing" the used automobiles from Joe Simpkins, Inc. in such a way that they could retain the profits from them. Ford had complained particularly about the older model automobiles, and "it was decided that because [plaintiff] had felt that if he were active politically more than he had been, that Joe

Simpkins, Inc. possibly could get some sizable and additional business." Mr. Simpkins further testified that "the conversation was to the effect that the Democratic Party had had a sizable deficit, and he [plaintiff] thought by making a sizable contribution that that could help us in obtaining later business." According to Mr. Simpkins it was agreed between him and plaintiff that "pre-war" automobiles would be sold by Joe Simpkins, Inc. to Hannibal Motors, Inc. for $25. each, and that the profits of Hannibal Motors, Inc. from the disposal of these automobiles would be used for political activity by plaintiff. Mr. Simpkins testified that he paid to Plaintiff "approximately five or six thousand dollars," that all payments were made by him in currency, that the first payment was $3,500, and that this was made to plaintiff before Hannibal Motors, Inc. had made any actual profits. Many of the used automobiles sold to Hannibal Motors, Inc. were sold by it for salvage, but some were sold by the used car salesmen of Joe Simpkins, Inc., and the salesmen were paid their commission by Mr. Simpkins personally or by Hannibal Motors, Inc. These automobiles remained on the premises of Joe Simpkins, Inc. until sold, and Hannibal Motors, Inc. did not pay Joe Simpkins, Inc. for use of its lot and facilities. Tom Ramacciotti sold some of these automobiles and Hannibal Motors, Inc. paid his commissions by check.

Mr. Leber testifed that he was told by plaintiff and Mr. Simpkins that all "pre-war" automobiles were to be sold to Hannibal Motors, Inc. for $25 each to accumulate funds for political purposes. Mr. Sakowski also testified that in 1953 he was told by plaintiff and Mr. Simpkins that Hannibal Motors, Inc. was to buy the "pre-war" automobiles for $25 each, but they did not tell him the purpose. The sale of these automobiles to Hannibal Motors, Inc. and the price paid was shown on the books and records of Joe Simpkins, Inc.

In his testimony plaintiff denied categorically (1) that he had any conversations with Mr. Simpkins concerning the sale of the "pre-war" automobiles to Hannibal Motors, Inc., (2) that he discussed with Mr. Simpkins about severing these automobiles from Joe Simpkins, Inc. but retaining the profits, (3) or that he had discussed with Mr. Simpkins that the Democratic Party had a sizable deficit and that a contribution would assist in obtaining business. He also denied that he received any currency from Mr. Simpkins for the purposes testified to by Mr. Simpkins, but he admitted he had received currency from him for other purposes.

Mr. Simpkins testified that these sales to Hannibal Motors, Inc. were discontinued "sometime in 1955" because "we weren't getting anywhere with the political aspect of it and there was no use going on trying to get business through that type of activity."

There can be no question but that if without the knowledge and consent of plaintiff, Mr. Simpkins arranged to have the "pre-war" automobiles sold by Joe Simpkins, Inc. to Hannibal Motors, Inc. below their actual value, this activity was a breach of confidence and trust, and plaintiff is entitled to have the improperly acquired profits returned to Joe Simpkins, Inc. However, if the testimony of Mr. Simpkins, Mr. Leber and Mr. Sakowski as to the knowledge and consent of plaintiff and the purpose of the arrangement is to be believed, then for the reasons previously set out plaintiff is not entitled in this action to have restitution to Joe Simpkins, Inc. The trial court found these fact issues in favor of Mr. Simpkins and Hannibal Motors, Inc. Plaintiff has advanced no reason why we, as an appellate court who did not hear and observe these witnesses, should be in a better position than the trial court (or for that matter in an equal position) to determine which factual version is correct.

These transactions occurred at a time when by his own statement plaintiff was participating in the determination of all "major policies" of Joe Simpkins, Inc. and

was present at its place of business practically every day spending a substantial amount of time in policy making and administrative duties. The automobiles transferred to Hannibal Motors, Inc. remained on the used car lots of Joe Simpkins, Inc., and the sales were shown on the books of the company which plaintiff supervised and of which he was in charge and at all times had access. Tom Ramacciotti, plaintiff's son, participated in selling some of these automobiles for Hannibal Motors, Inc., and although Tom was available he was not called as a witness. It was for the performance of the duties above mentioned that plaintiff was accepting a substantial salary. The trial court's findings of these facts in favor of Mr. Simpkins and Hannibal Motors, Inc. are clearly justified by the record, and we find no impelling circumstances which tend to impeach those findings. For these reasons, as to both parts of plaintiff's second point we defer to the findings of fact of the trial court.

Plaintiff's third and last point pertains to certain transactions which occurred after the sale in August 1956 to Mr. Pappas. Plaintiff asserts that the trial court erred in failing and refusing to require Mr. Simpkins to account "for any and all profits" realized by him from the transactions in which he acquired eight vehicles, referred to as "service vehicles" which had belonged to Joe Simpkins, Inc. and "which were sold by it through him to Vandeventer Auto Sales and by him purchased from Vandeventer Auto Sales."

The sale to Mr. Pappas did not include the automobiles on hand. Also not included were eight vehicles used in the operation of the business consisting of a 1951 Ford dump truck, a 1953 Ford pick-up truck, two 1953 flat bed Ford trucks, and two Ford tractors and two trailers. Plaintiff arranged for a Mr. Ousley, who was in the "automobile business" in Granite City, Illinois, to appraise "all of the vehicles we had at the time we went out of business." Forty of these vehicles were sold to a company owned by Mr. Leber at a price in excess of $40,000. Although plaintiff testified that he "had nothing to do with that sale" and that Mr. Simpkins "made the sale" of these automobiles "below cost," in a memorandum prepared by plaintiff he referred to "my sale to Leber," and at trial he admitted that he "approved" the sale. According to plaintiff, Mr. Ousley also appraised the eight service vehicles in excess of $10,000, but there is a substantial question whether Mr. Ousley actually saw those vehicles. Mr. Ousley did not testify. The original cost of the service vehicles was $13,414.47, and they had been completely depreciated on the books of the company.

Plaintiff's son, Tom Ramacciotti, had the service vehicles appraised by Mr. Yaffe, an automobile salesman who made a bid to purchase them in the amount of $3,000. The testimony indicates that Tom Ramacciotti, who was also an experienced used car salesman, thought this was a good price. According to Mr. Simpkins, he told plaintiff about this offer to purchase for $3,000, and Mr. Simpkins suggested that the matter be discussed with Mr. Leber. Mr. Simpkins then called by telephone a Mr. Fishel with Vandeventer Auto Sales, and after the vehicles were described Mr. Fishel offered to purchase them for $3,500 provided that they be delivered to a farm he had on Conway Road. An invoice from Joe Simpkins, Inc. to Vandeventer Auto Sales describing the eight vehicles was dated August 30, 1956. Mr. Fishel later examined the vehicles, and then called Mr. Simpkins and told him that they were not in as good a condition as he had represented them to be, and that they were not worth $3,500, but he stated that he might be able to sell some of them. Later, Mr. Fishel reported that a customer had shown some interest in the two tractors and trailers, and that if he sold those vehicles he might be able to sell the remaining. Mr. Fishel then sent his check, dated October 17, 1956, in the amount of $3,500, payable to Joe Simpkins, Inc. However, the contemplated sale was not completed. Mr. Simpkins then agreed to reimburse Mr. Fishel personally, which he did in currency, and a bill of sale from Vande-

venter Auto Sales was made to Frank Leber, Inc., at the suggestion of Mr. Fishel so that the payment of a sales tax could be avoided. A deposit slip at the Manchester Bank of St. Louis shows a deposit on October 19, 1956, to the credit of Vandeventer Auto Sales in the amount of $3,500.

Mr. Simpkins further testified that after he "took them back from Fishel," apparently referring to the two tractors and trailers, he told plaintiff that "we would use them for the leasing company until maybe I sold them, but temporarily we would use them for the leasing company," and that plaintiff "was agreeable." At this time, and until February 1957, plaintiff and Mr. Simpkins each owned half of Joe Simpkins Leasing Company.

Mr. Leber subsequently sold the Ford pick-up truck for $690. Three of the vehicles had been left at Mr. Fishel's farm because they would not run, and in March of 1959, they were sold to Vandeventer Auto Sales for $400. The two tractors and trailers were sold in October 1959 to Glen Thomas Auto Sales, Inc. for $2,000. It thus appears that Mr. Simpkins received a total of $3,090 for the service vehicles, or $410 less than the $3,500 he paid. The evidence is rather clear that Mr. Simpkins did not have any beneficial use of the vehicles other than the tractors and trailers. Whatever use the Joe Simpkins Leasing Company had of the tractors and trailers while plaintiff owned half of that company benefited him to the same extent as Mr. Simpkins. Assuming they were used by Joe Simpkins Leasing Company after plaintiff sold his interest, the most to which plaintiff would be entitled, assuming this third point to be meritorious, would be to have Mr. Simpkins restore to Joe Simpkins, Inc. the reasonable value of the use of the two tractors and trailers after February 1957 until they were sold, less $410.

The trial court found the issues against plaintiff. Joe Simpkins, Inc. received $3,500 for the vehicles, and there is no persuasive evidence in the record that they were worth more than that. They had been completely depreciated on the books, and Tom Ramacciotti, an experienced used car salesman thought $3,000 was a proper price for them. Mr. Fishel said they were not worth $3,500, Mr. Yaffe said their value was $3,000, and Mr. Simpkins said they were worth $3,500.

Plaintiff stated that he was not qualified to estimate the market value of the vehicles. The only evidence that they were worth more than $3,500 was the testimony of plaintiff that Mr. Ousley had told him they were worth more than $10,000, a figure contrary to common knowledge in view of their original cost and age, and it appears that Mr. Ousley may not have ever seen the vehicles. The trial court properly could have found that Mr. Simpkins did not profit and that Joe Simpkins, Inc. did not lose by reason of these transactions.

Mr. Simpkins testified that he discussed with plaintiff the appraisal obtained by Tom Ramacciotti, and that plaintiff was present when he called Mr. Fishel and arranged to sell the vehicles for $3,500. He also testified that after he had acquired the vehicles he told plaintiff that they would be used by Joe Simpkins Leasing Company, of which plaintiff then owned half. If plaintiff knew these facts he was aware of all the material facts pertaining to the transactions, and he concurred therein, and the trial court properly could have so found from the evidence. At least plaintiff did not complain when the two tractors and trailers were being used for the benefit of a company of which he was part owner.

It is true that this transaction has badges of improper conduct, and at best it indicates a loose or possibly an improper way of doing business. However, the explanation of Mr. Simpkins, if believed, is not improbable or impossible. Loose and questionable business practices apparently were not an uncommon occurrence by both Mr. Simpkins and plaintiff. For example, plaintiff wrote minutes of meetings long after the meeting, if any, was held showing persons

present who were not there. He also performed acts not then authorized by board action, and then subsequently wrote the minutes showing an authority. He loaned $65,000 of corporate money to Ronan Investment Company, of which he owned 98% of the stock and his family owned the rest, at 3% and then borrowed the money from Ronan Investment Company for personal use at 5%. From time to time he cashed coupons from bonds belonging to Joe Simpkins, Inc. and placed the money in his personal bank account awaiting, he said, a suitable investment. According to Mr. Simpkins, he and plaintiff participated in changing records of Joe Simpkins, Inc. to indicate falsely the disposition of certain automobiles obtained from the Ford Motor Company. Finally, plaintiff received checks from Tri-City Motor Company (which was "Mr. Ousley's company") made payable to Joe Simpkins, Inc. He then indorsed the checks and without the knowledge of Mr. Simpkins and without running them through the accounts of Joe Simpkins, Inc., he returned them to Mr. Ousley to be used as a loan from Joe Simpkins, Inc. to Tri-City Motor Company of which plaintiff was then a "qualifying director" and acted as attorney.

Whether the trial court by its general judgment found the issues as to this third point against plaintiff because it found as a fact that Mr. Simpkins did not profit and Joe Simpkins, Inc. did not lose by the transactions, or because it found as a fact that the conversations between Mr. Simpkins and plaintiff did take place and plaintiff knew the material facts of the transactions, is not a determination necessary for us to make on this appeal. Each conclusion is clearly justified by the evidence, and we cannot say that either conclusion was clearly erroneous. In such situation we defer to the findings of fact of the trial court.

The judgment is affirmed.

BARRETT and PRITCHARD, CC., concur.

PER CURIAM.

The foregoing opinion by STOCKARD, C., is adopted as the opinion of the Court.

All of the Judges concur.